# Exhibit 14

## Redacted Portion
## Filed Under Seal

```
 1                      IAN MOORE

 2            C O N F I D E N T I A L

 3          UNITED STATES DISTRICT COURT

 4          SOUTHERN DISTRICT OF NEW YORK

 5

 6                           Case No: 1:22cv6206

 7   ------------------------------

 8   PIONEER BUSINESS SERVICES, LLC d/b/a

 9   FOUR CORNERS AVIATION SERVICES,

10          Plaintiff,

11          v.

12   VISTAJET US, INC.,

13          Defendant.

14   -----------------------------------

15

16    Deposition of IAN MOORE, taken by AILSA WILLIAMS,

17       Certified Court Reporter, at the offices of

18    Stephenson Harwood, London, United Kingdom, on 8

19               December, 2022 at 9:43 a.m.

20

21

22

23

24

25    Job No. 219381
```

1                    IAN MOORE

2                    IAN MOORE

3              Having been sworn,

4              testified as follows:

5         DIRECT EXAMINATION BY MR. HAVALES:

6              MR. HAVALES:  Good morning, Mr. Moore.

7    As you heard a moment ago my name is Peter

8    Havales. I am one of the attorneys for the

9    plaintiff, which I will refer to simply as FCA

10   throughout the course of the deposition today.

11             Some basic pieces of guidelines for us

12   to get going.  First, our court reporter is the

13   most important person in this room, so we need to

14   make sure, to the best extent possible, that we

15   don't speak over each other.  I will try to make

16   sure you are done with your answer, and if you

17   make sure I am done with my question before we

18   speak, it will make Ailsa's job a whole lot

19   easier.

20             Secondly, I will be from time to time

21   giving you documents, so you should take your

22   time, be comfortable with them, before you answer

23   any questions.  My practice would be to give it to

24   you, ask you to look at it, and once you advise me

25   that you have finished looking at it I will begin

1                    IAN MOORE

2  as our next exhibit, Exhibit 21, an email from you

3  to Mr. Deiana, dated the 24th, and it bears Bates

4  numbers VJ1927 through 1946.

5        (Exhibit 21 marked for identification)

6             You will see first, on the 24th, Mr.

7  Deiana had forwarded you an email that he received

8  from Ms. Kennedy, which we reviewed earlier, and

9  then you sent to him an email saying "This has

10  just been sent to us in the last 24 hours".  Is

11  there a reason you sent the brochure on to Mr.

12  Deiana?

13        A    To reaffirm his stance as to why we

14  don't want to do this type of transaction.

15        Q    You then say, in a different color

16  ink in the email:

17             "If this gets to Thomas, which it will,

18  then the entire relationship is ruined."

19             When it is referring to "entire

20  relationship", is that referring to the

21  relationship with SoftBank?

22        A    If I remember correctly at the time,

23  I think I would be referring to that, yes.  To be

24  honest with you, I think the word "relationship"

25  is probably -- I would say the entire transaction

```
 1                    IAN MOORE

 2   is ruined, not necessarily relationship.  I was

 3   angry at this point.

 4           Q   Okay.  Let me show you a

 5   reproduction of -- I can't tell if it is text

 6   messages or WhatsApp messages from the way it is

 7   produced, but it purports to be an exchange with

 8   Mr. Flohr.  It doesn't have a date but it says

 9   13:22 at the very top for the timeframe?

10           A   It has a date at the top.

11           Q   It does.  It has on the email on the

12   first picture, first text message.  I apologize.

13   June 24.  VJ8994 through 8998.  You can take a

14   moment to look at that and I will ask you some

15   questions.

16           As he does that, Mr. Franco, I will

17   remind you of the letter I sent to you the day

18   after Thanksgiving about the obligation to produce

19   the electronic form of the text messages, as

20   required under the ESI protocol, as opposed to

21   just screenshots of text?

22           MR. FRANCO:  We are looking into that,

23   yes.  We will get back to you.

24           MR. HAVALES:  Thank you.  Soon I hope.

25           (Exhibit 22 marked for identification)
```

```
 1                        IAN MOORE
 2            Let me know when you have finished going
 3      through and then we will walk through them
 4      together.
 5            A    No, I know it very well.
 6            Q    I understand that, but it is always
 7      good to make sure you have looked at it.  Let's
 8      start on page 1 then, since this one, unlike the
 9      emails, is in a chronological sequence from top to
10      bottom.  Is the first email or the first text --
11      let me ask first -- is this using text, WhatsApp
12      or some other mode of communication here?
13            A    It is WhatsApp.
14            Q    On Friday, June 24, you send a
15      WhatsApp message with a copy of the brochure,
16      correct?
17            A    Correct.
18            Q    And below that you say:
19            "Just got this.  This is who SB sold
20      Marcelo's hours to.  Strictly in the contract they
21      COULD NOT do this.  We were told it was for A
22      select few of the Four Corners client base."
23            Those three messages -- continuing:
24            "Now this is being sent around.  I have
25      legal on it.  We may be able to strike this as a
```

1                    IAN MOORE

2    breach and keep the cash."

3           Are those six balloons that I just read

4    messages by you?

5           A    Correct.

6           Q    And when you say "Strictly in the

7    contract they COULD NOT do this", at the time that

8    you sent this WhatsApp message to Mr. Flohr, had

9    you yourself personally reviewed the Addendum to

10   the Assignment in the Program Agreement that

11   talked about what FCA could and could not do?

12          A    No, I did not.  It was the spirit I

13   was talking about.

14          Q    In the next balloon it says:

15          "We were told it was for a select few of

16   the Four Corners client base."

17          Is that based on what Ms. Qi related to

18   you back some time in March of 2022?

19          MR. FRANCO:  Objection.

20          A    And my legal counsel at the time, so

21   between --

22          MR. FRANCO:  Wait.  Do not disclose

23   anything that your counsel told you.

24          MR. HAVALES:  Was your counsel on that

25   phone call with someone from FCA, where she just

```
 1                     IAN MOORE

 2            A    It was not, no.

 3            Q    And I am correct, just to reconfirm,

 4    so I don't draw any incorrect conclusions, you

 5    don't recall reviewing either this document or the

 6    original counterclaim filed in August at any time,

 7    correct?

 8            A    Not in great detail, no.

 9            Q    Do you recall if you reviewed it at

10    all, whether it is superficially or otherwise,

11    prior to yesterday?

12            A    No.

13            Q    Are you aware of any documents or

14    conversations indicating that third parties were

15    confused by the brochure and thought that FCA was

16    affiliating with or a part of VistaJet?

17            A    I know of third parties

18    understanding that we had a partnership with Four

19    Corners.

20            Q    And when you say third parties who

21    thought there was a partnership, who were those

22    third parties?

23            A    They were clients.

24            Q    Could you give me their names

25    please?
```

1                     IAN MOORE

2          Do I have to give the names?

3          MR. HAVALES:  We can designate it as

4    confidential.

5          MR. FRANCO:  Let's just do that now.  I

6    can do it later but I just designate this portion

7    of your testimony as confidential.

1                          IAN MOORE

12          A   And that they had been approached.

13   It had been angled -- it would be Vista but

14   cheaper, and they actually said they had no

15   intention of doing the deal, but they wanted to

16   let us know.

17          Q   Did that individual say whether he

18   had received a copy of the brochure?

19          A   I don't recall.

20          Q   Did that individual say who had

21   approached him about the hours being offered by

22   FCA?

23          A   He didn't want to go into any

24   further details.  I knew exactly what he was

25   talking about.  I said "that won't be available"

1                        IAN MOORE

2  and he said "okay".

3            Q   I was just asking about what he did

4  and did not say.  You said there were at least

5  three.  What is the second instance of which you

6  were aware?

7            A   To be honest with you that is the

8  more specific one.  The other ones would have been

9  through hearsay, would have been through what I

10 was told, that there was multiple brokers, et

11 cetera, et cetera.

12           Q   What you were told by other VistaJet

13 employees?

14           A   Correct.  This one was directly from

15 me.

16           Q   With the others, what you were told

17 by other VistaJet employees, did any of them

18 identify the name of any parties to you who had

19 expressed they were confused?

20           A   No, it was more of a general term of

21 multiple brokers.

22           Q   And the general term was that

23 multiple brokers were offering the hours or had

24 received the brochure and were offering the hours

25 on behalf of FCA.

1                    IAN MOORE

2            MR. FRANCO:  Objection.

3            A    It was not defined.  It was just

4    that people were aware of a partnership that had

5    not been agreed upon.

6            Q    Did your colleagues at VistaJet,

7    when sharing this informing with you, use the word

8    "partnership"?

9            A    Correct, yes, they used the word

10    that there was a partnership and has this been

11    approved by us?

15            A    No, I can't recall.

18    you described it, from individuals at VistaJet,

19    are you aware of any other customers or clients or

20    potential customers of VistaJet who expressed

21    confusion, as a result of the brochure?

22            A    I was not aware of all my sales

23    team, who they were speaking to.  All I know is

24    that we had both David Lawrence and Steve

25    Malvesta, the two people on that email, had talked