UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**CASE NO. 1:22-cv-06206-ALC**

PIONEER BUSINESS SERVICES, LLC d/b/a
FOUR CORNERS AVIATION SERVICES,

      Plaintiff/Counter-Defendant,

      v.

VISTAJET US, INC.,

      Defendant/Counter-Plaintiff.

_____/

**MEMORANDUM OF LAW IN SUPPORT OF**
**VISTAJET US, INC.'S MOTION FOR SUMMARY JUDGMENT**

Booking a flight with VistaJet is not like booking a flight with American Airlines, Delta, or even another private charter flight provider. That is because VistaJet's flagship service is a multi-year membership program, which is not designed to sell occasional flights to members of the public who can easily access the going-rate. Instead, VistaJet provides one-of-a-kind concierge service to ultra-high-net-worth individuals and corporate entities who reserve large blocks of flight hours on private jets, which are subject to expiration.

To protect its reputation and goodwill with its sophisticated client base, VistaJet maintains the strict confidentiality of the commercial terms applicable to its individual members. For example, VistaJet not only prohibits its members from disclosing the commercial terms of their contracts to third parties without VistaJet's prior written consent, but VistaJet also keeps its commercial terms secret from its **own personnel** who deal with the broader charter market, ensuring VistaJet's ability to preserve its relationships with its existing customers and negotiate effectively with new prospective customers. *See* Statement of Undisputed Facts ("SUF") at ¶ 49.

After obtaining an assignment of a block of VistaJet flight hours under false pretenses, however, FCA breached several interlocking contractual provisions specifically designed to address VistaJet's concern that its business interests, goodwill, and reputation would be adversely affected if its confidential commercial "terms, conditions, et cetera," ended up "in the marketplace" as a consequence of the assignment. SUF at ¶ 37. Without VistaJet's knowledge or consent, FCA divulged VistaJet's sensitive commercial information in marketing materials that FCA disseminated as widely as possible, including to ultra-high-net-worth individuals and corporate entities likely to charter private flights; bankers and others who might know additional potential customers; private aviation brokers who generally deal with the wider charter market; and even VistaJet's prospects and existing customers, who were encouraged to breach their agreements with VistaJet to obtain better prices and service through FCA. *See* SUF at ¶¶ 113; 123-130. To make matters worse, FCA's marketing materials infringed VistaJet's intellectual property—including VistaJet's trademarks and copyrighted photographs—to imply a nonexistent partnership with VistaJet designed to raise the profile of FCA's nascent brand and build its competing business wholly on the back of VistaJet's goodwill and reputation. *Id*. at 131-136.

After being notified that its flagrant misconduct constituted a default under the parties' agreements, FCA went out of its way to exacerbate the harm to VistaJet. FCA not only refused to disclose the recipients of the confidential information so that VistaJet could attempt to assess and mitigate its injury, for example, but it also continued to make illicit disclosures of VistaJet's confidential information while soliciting VistaJet's own clients. *Id*. at ¶¶ 141-146. Adding insult to injury, FCA moved to compel VistaJet to support FCA's illicit business by demanding an extraordinary emergency mandatory injunction based on a knowingly false affidavit. *Id*. at ¶¶ 147-151. At bottom, summary judgment is warranted because there is no genuine dispute of

2

material fact that (a) FCA breached its written agreements with VistaJet, (b) infringed VistaJet's intellectual property rights, and (c) VistaJet, by merely exercising its contract right to put a stop to FCA's wrongful actions, did not tortiously interfere with any of FCA's business relationships.

## FACTUAL BACKGROUND

### A.    FCA Obtains an Assignment of Flight Hours at a Confidential Discounted Rate

Over the past eighteen years, VistaJet and its affiliated entities have grown to become a world leader in private aviation, building a multi-billion-dollar infrastructure to ensure that VistaJet customers have guaranteed access to a global fleet of private jets, 365 days a year. *See* SUF at ¶ 1.

VistaJet's reputation and business relationships depend, in large measure, on its ability to maintain the confidentiality of its commercial terms. Because VistaJet provides a specialized service targeted at a niche market, it negotiates tailored rates for each individual customer based on their specific flight profile, including the number of hours flown. Thus, if a competitor or even other customers were to learn VistaJet's discounted rates for a particular client, that disclosure could diminish or destroy VistaJet's relationships with its existing customers and make it difficult or impossible for VistaJet to effectively negotiate its rates for new and prospective customers. For this reason, VistaJet prohibits its members from divulging the commercial terms of their contracts to third parties, and even keeps its sensitive commercial information a secret from its own personnel who deal with the wider charter aviation industry. *See* SUF at ¶ 49.

In 2020, at the height of the Covid pandemic, one of VistaJet's largest customers, SoftBank, negotiated ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

▨▨▨▨ *Id*. at ¶¶ 5-7. Under its Program Agreement with VistaJet, SoftBank was required to maintain the confidentiality of VistaJet's pricing and commercial terms. *Id*. at ¶ 12 ("SoftBank agreed 'not to disclose the legal and commercial terms of th[e] Program Agreement to any third party without VistaJet US's prior written approval . . ."). By early 2022, SoftBank determined that it could not use ▨▨ of the hours it had purchased and requested VistaJet's permission to assign those unused hours rather than forfeit them.

Enter FCA. In contrast to VistaJet's long history of sustained success as a private flight provider for its members, FCA is a money-losing aircraft management company created in 2021, which had only two clients as of January 2022. *See* SUF at 52. To induce the assignment, FCA (mis)represented to VistaJet that it had a stable of clients "that purchased aircraft," and "were waiting for delivery of the aircraft[,]" and thus led VistaJet to believe that the hours FCA acquired from SoftBank "would be specifically used for them for the pre-aircraft delivery lift." *Id*. at ¶ 36.

When negotiating the assignment, both SoftBank and FCA recognized the importance of honoring the confidentiality clause in VistaJet's Program Agreement. Specifically, SoftBank dutifully requested—and obtained—VistaJet's consent before disclosing the agreement to FCA. *Id*. at ¶ 14. In addition, SoftBank required FCA to execute a non-disclosure agreement promising to "keep confidential and not disclose . . . any pricing terms in SoftBank's contract(s) with VistaJet US." *Id*. at ¶¶ 17-18; *accord id*. at ¶ 21 (SoftBank emphasizing that FCA could not "share the details of our program agreement with third parties without our consent" and that, if consent was given, FCA would have to ensure the third party also "signs an NDA"). In turn, according to FCA's CEO Brian Proctor, FCA understood the confidential information to include the "purchase price of the hours . . ., how many hours," and "terms of the deal." *Id*. at ¶ 19.

When FCA learned the confidential pricing terms that VistaJet had provided to SoftBank, as one of its most significant customers, it assumed that it could purchase them and resell them for a significant profit. At the time of the assignment, the market rate for charter flights was $17,500 per hour, but VistaJet's confidential discounted rate for SoftBank was ██████ per hour. Thus, FCA planned to purchase the hours from SoftBank "at a steep discount . . . to the market at ███████" per hour, which, according to Proctor, "should be a good/quick return." *Id*. at ¶¶ 30-32.

While VistaJet hoped to make "SoftBank happy," its "biggest reservation" about condoning its assignment of flight hours to FCA was the risk that its highly confidential commercial "terms, conditions, et cetera," "would be in the marketplace." *Id*. at ¶ 37. Despite its concerns, VistaJet ultimately approved the assignment based on FCA's expressed intention to resell the flight hours to a "stable of 4 or 5" of its clients who had a temporary need for flight hours while awaiting delivery of their own private jets, and FCA's willingness to agree to several interlocking contractual provisions designed to protect VistaJet's sensitive commercial information. *Id*. at ¶¶ 36-46. In the end, VistaJet had no obligation to agree to the assignment that SoftBank requested, and so it was careful to structure the deal in a manner that protected itself from the risk that FCA would release its sensitive commercial information. *Id*.

Specifically, VistaJet only agreed to the assignment according to the following terms that it deemed essential to preserving its reputation and its continuing business prospects:

<u>First</u>, the Assignment Agreement between VistaJet and FCA incorporated the terms of the underlying Program Agreements between VistaJet and SoftBank, double-bolting a strict confidentiality pledge in which FCA reiterated its obligation not to disclose any information

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



*Id*. at 45.



*Id*. at ¶ 46; *accord* at *id.* (FCA agreeing that ████████████████████████████ ████████████████████████ *id*. at ¶¶ 47-48 (FCA's COO who negotiated the assignment conceding that FCA agreed to "not disclose the contents of the agreement").

Second, the Assignment Agreement reflects the misrepresentation that FCA conveyed to induce the assignment by expressly limiting FCA's right to resell the flight hours to no more than eight potential customers "pre-approv[ed]" by VistaJet, which VistaJet could withhold for any reasonable reason, including "if such customer is an existing VistaJet client":



*Id*. at ¶ 44.

Third, to further restrict FCA's ability to misappropriate VistaJet's hard-earned reputation and relationships, VistaJet did not provide any license for FCA to use VistaJet's name, branding, logo, or intellectual property, while emphasizing that FCA and VistaJet do not share any ongoing business relationship:



*Id*. at ¶ 131.

**B.**     **FCA Faces Foreseeable Time Constraints and Financial Pressure that Leads It to Breach the Parties' Agreements**

The block of flight hours that FCA obtained by way of an assignment were initially sold to SoftBank according to extraordinarily favorable confidential pricing terms that VistaJet offered to one of its largest customers at the height of the Covid pandemic. *Id*. at 7. Additionally, because VistaJet requires a steady stream of revenues and costs necessary to ensure year-round availability of flights, *id*. at ¶ 163, the hours that SoftBank purchased were subject to the same "use it or lose it" scenario applicable to all of VistaJet's members, in which its unused hours were subject to partial expiration on an annual basis, with all remaining unused hours set to expire at the end of the three-year contract term. *Id*. at ¶ 10. Thus, while FCA believed that the assignment presented an opportunity to achieve "a good/quick return," *id*. at ¶ 32, it was put "officially on the clock" to sell the hours as quickly as possible after it obtained the flight hours in April 2022. *Id*. at ¶ 62.

With only 17 months to resell the flight hours before they would expire in ████████, FCA was effectively holding a leaking bucket, as the value of its investment was continually deteriorating over time. In other words, FCA had a "limited time to sell these ████ hours" because, for every day that passed without a block of flight hours being resold, a potential purchaser would have less time to use the hours before they expired, reducing the amount of money that he would be willing to pay for them. *Id*. at ¶¶ 63-64. Adding to these inherent time constraints, FCA also faced substantial financial pressure because it did not have the funds available to purchase the hours from SoftBank that it hoped to resell for a profit. Thus, FCA took out an $11 million loan, which it secured with personal guarantees, including $5

million of their guarantors' personal cash kept in the lending bank. *Id*. at ¶ 61. And the terms of its multi-million-dollar loan required FCA to make monthly interest payments, including interest, exacerbating the urgency to resell all the hours quickly. *Id*. at ¶ 65.

In short, as FCA's top executives explained, FCA had not only ventured into uncharted territory by arranging a deal that it described as unprecedented, *id*. at ¶ 33, but it also felt that it "had to sell" the flight hours "as fast as possible." *Id*. at ¶ 63. And, given that FCA was contractually limited to reselling approximately ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████, *Id*. at ¶ 60. In other words, FCA was counting on each customer, on average, prepaying it ████████████████████████████████████████ in the span of 15 months.

Early on, a few days after executing the Assignment Agreement, FCA realized that it could not meet its own aggressive estimates and faced a challenging situation. Apparently concluding that it had no other options, FCA ultimately determined that it needed to "cast the net far and wide" and "leverage all channels" and reach out to 280-300 prospects in an attempt to unload its unsold hours. *Id*. at ¶¶ 109-112. For instance, despite being limited to a maximum of eight customers, with very tight confidentiality and pre-approval restrictions, FCA announced the low rates they had obtained to the entire private aviation market regardless of its confidentiality obligations and regardless of how it would harm VistaJet's business and customer relationships. *Id*. at ¶ 113.

**C.    FCA Creates "Insight With Vista," Selling VistaJet Hours at a Lower Rate to Undercut VistaJet's Pricing And Steal VistaJet's Existing Clients**

To avert the adverse consequences of its own poor business decisions, FCA decided to

breach several core provisions of its agreements with VistaJet. Hoping to reach as many customers as possible as quickly as possible, FCA created a "sales presentation" in the form of a marketing brochure for a product it dubbed "Insight with Vista," which mimicked VistaJet's flagship program. *Id*. at ¶¶ 93-97. The brochure was created primarily by FCA's COO, who testified that he never sought VistaJet's permission before essentially "repeat[ing] what was in the agreement between [FCA] and VistaJet[,]" despite its confidential nature. *Id*. at ¶ 104; *accord* DE 77 at ¶ 33 (Answer) (FCA admitting that it "did not seek consent for or authorization of the contents of the Brochure" from VistaJet).

Although VistaJet never granted FCA a license to use its trademarks or photographs, FCA's marketing campaign—including variations of its sales presentation—prominently featured VistaJet's name and trademarks, including FCA's marketing brochure which included unauthorized copies of the VISTAJET and VISTA marks, the VISTAJET logo, and copyrighted photographs of VISTAJET aircraft on the cover and virtually every other page that followed. *See* SUF at ¶¶ 95, 98-108. FCA's sales presentation also misrepresented that FCA "contracted with VistaJet" to "remarket" VistaJet hours, while disclosing the confidential terms of VistaJet's Program Agreement. *Id*. at ¶¶ 96-97.

To capitalize on the opportunity to "build" and "develop a long-time client" that would not "come along every day or every month or every year," *id*. at ¶¶ 55 & 58, FCA's executives decided not to consult with VistaJet or obtain VistaJet's consent before indiscriminately disseminating the marketing brochure to hundreds of recipients essentially comprising the private aviation industry at large, including to: Bombardier, Gulfstream, Clay Lacy Aviation, Aviation Portfolio, Silver Air, Sun Air Jets, Hillsboro Aviation, Pacific Aviation, Aerohead Aviation, and many others. *Id*. at ¶ 113. Moreover, between March and July 2022, FCA contacted at least 86 individuals and

companies, including brokers and other industry players, through phone calls, text messages or in person, to market VistaJet hours. *Id*.

The carelessness with which FCA treated VistaJet's confidential commercial information is exemplified by the following narrative involving Vincent Kavanagh, a former VistaJet employee who would eventually be named FCA's Head of Sales. In June 2022, Mr. Kavanagh was not employed by VistaJet or FCA, but rather merely interviewing for a job at FCA. Nevertheless, at that time—before Mr. Kavanagh was even hired to be an FCA employee—FCA's CEO and COO both authorized Mr. Kavanagh to market the VistaJet hours, without informing him that the existence and contents of the agreements between FCA and VistaJet were confidential, and without requesting or obtaining a signed non-disclosure agreement from Mr. Kavanagh. *Id*. at ¶¶ 118-122. Following the direction of FCA's CEO and COO, Mr. Kavanagh distributed copies of the "Insight with Vista" brochure to actively solicit customers—**including VistaJet's current customers**—by representing that FCA's rates were "an absolute steal of a deal[.]" *Id*. at ¶ 124; *accord id*. at ¶¶ 123-126 (describing FCA's strategy to offer lower rates to the wider market to compete against VistaJet, undercutting VistaJet's price).

And, in addition to disclosing VistaJet's confidential commercial terms without prior written approval, FCA and Mr. Kavanagh did not limit their marketing efforts to a maximum of eight potential customers—any of whom VistaJet could reject for any reason, specifically including if that customer was an existing VistaJet client. Instead, FCA and Mr. Kavanagh targeted VistaJet's current clients, claiming that they would save money by contracting with FCA instead of VistaJet. *Id*. at ¶ 125 ("Existing VJ clients (the Chinese family who shared their VJ contract with us). I'll keep them on the hook."); *id*. ("They are out of hours with VJ on their current contract" and "I explained that the family . . . . will obviously have a significant cost saving."); *id*. ("great

opportunity for a VJ client, sincerely."). Likewise, FCA claimed that it would service VistaJet's clients better than VistaJet had. *Id*. at ¶ 126 (Q. And was that discussion your pitch, that the service level with Four Corners Aviation is better than it is with VistaJet? A. Yes.); *id*. ("Q. Okay.  And you're referring -- you're basically trying to say that FCA is going to provide better account management services than VistaJet? A. Yes.").

In short, the manner in which FCA operated with respect to its Head of Sales provides an illustrative, but not exhaustive, account of an overarching marketing campaign in which FCA elected to run roughshod over its contractual obligations to VistaJet. For instance, FCA's executives could not identify any contractual language permitting FCA to disclose the terms of the Program Agreement to third parties without VistaJet's consent, while admitting that FCA did not "ever ask VistaJet to agree in writing to the disclosure of any of the terms of the agreement," and VistaJet did not "ever provide FCA with written consent to disclose the existence or terms of the agreement," which it disclosed in its marketing brochure among other emails and communications. *Id*. at ¶¶ 115-117. Likewise, after agreeing that it could only resell its flight hours to up to eight customers "pre-approved" by VistaJet, and after acknowledging that a customer's status as an existing VistaJet client was reasonable grounds for withholding approval, FCA "did not get a pre-approval for any of the customers and they marketed material illegally to a wider market," including VistaJet's existing clients. *Id*. at ¶ 114 ("Again, they could not market or sell the hours without VistaJet pre-approval, which they are marketing now without pre-approval to whom they are marketing it to, which they have already sent it to the wider market."); *id.* ("On the card and who they are showing it to, they have not got our pre-approval."). *Accord id*. at ¶ 116 ("**Q**. Did FCA ever seek VistaJet's agreement in writing for any disclosures? [**FCA'S CEO**]. Not to my knowledge.").

And, despite the concession by its CEO that FCA was expressly prohibited from implying the existence of a partnership with VistaJet, FCA nevertheless infringed VistaJet's logo, branding, and intellectual property on a marketing brochure, and represented to an aviation broker on at least one occasion that its "Insight with Vista" "Opportunity" had been approved by VistaJet. *Id.* at ¶¶ 133-134.

**D.     VistaJet Provides Notice of an "Event of Default" and Demands Cure, which FCA Refuses to Do, and Instead Seeks Injunctive Relief Based on False Testimony**

On July 1, 2022, immediately upon learning that FCA had disclosed the confidential terms of the Program Agreement to third parties, VistaJet notified FCA that it had "triggered an Event of Default," and demanded that FCA take immediate steps to cure, including to: "stop circulating any and all written documents and/or communications relating to VistaJet," "[p]rovide VistaJet with copies of all Documents circulated to . . . external parties" and "[p]rovide VistaJet a list with each recipient of the Documents as well as their contact information." *Id*. at ¶ 141. VistaJet also notified FCA that its brochure "uses VistaJet's trademark and good will to market FCA's services," and "is replete with the unauthorized use of VistaJet's Intellectual Property, which includes, but is no way limited to, its names, logos, livery, and imagery such as photos of the aircraft exterior and interiors." *Id.* at ¶ 142.

But rather than accept VistaJet's invitation to ameliorate the effects of its wrongful conduct, FCA dug in its heels. Not only did FCA refuse to provide the names of any of the recipients of the Brochure, but it also continued to disclose the confidential terms of VistaJet's Program Agreement to an even wider audience by further disseminating its marketing brochure despite VistaJet's demand that FCA refrain from doing so. *Id*. at ¶¶ 143-146.

On July 6, 2022, days after receiving VistaJet's cease-and-desist letter, FCA's Head of Sales wrote to FCA's CFO: "I just can't see how it makes sense for us not to engage with these

prospects (according to VJ's latest request). For example - if one of our intended 8 clients had many business ventures and partners; would we/VJ ever really know [who] is taking the trips?" *Id*. at ¶ 144. Mr. Kavanagh, FCA's Head of Sales, testified that, despite receiving VistaJet's cease-and-desist letter, he continued to disseminate the brochure and promote FCA's "Insight with Vista" product, over VistaJet' objections. *Id*. at ¶ 145.

Then, on July 19, 2022, FCA filed suit against VistaJet. *See* DE 1-1. Along with its Complaint, FCA filed a motion seeking a temporary restraining order supported by the affidavit of FCA's CEO, Brian Proctor, which was filled with materially false statements, including that, "[a]s of today, no representative of FCA has disclosed to anyone ... the 'legal and commercial terms of the Program' which is the subject of the Program Agreement." *See* DE 7-2. Mr. Proctor's declaration similarly misrepresented that FCA was unable to secure alternative flights, and that it would lose all of its clients and run out of business in the absence of an emergency injunction compelling VistaJet to continue flying FCA's customers under protest. *Id*. As admitted under oath by FCA's Head of Sales, however, FCA was able to secure alternative flights. *Id*. at ¶ 150. And, while FCA retained its largest client, its other purported "client" was not a client at all, but rather a business relationship equivalent to "cheap sex," in the words of FCA's CFO. *Id*. at ¶¶ 165-166.

**F.    FCA's "Event of Default" And Refusal to Attempt Any Cure Excused VistaJet from Further Performance**

VistaJet and FCA are two equally sophisticated parties who were represented by exceedingly competent counsel in their arms-length negotiations that produced a reasonable provision defining the parties' rights and obligations in the event of FCA's default. *Id*. at ¶¶ 42-43. Under that provision, FCA is not required to pay VistaJet a fixed sum of money for its breach, but rather agreed that it would be prohibited from using its flight hours and gradually forfeit its

remaining flight hours on a proportional basis covering the duration of any uncured default:



*Id*. at 152. Notably, FCA has adopted and incorporated a substantially similar—**albeit more draconian**—liquidated damages provision in its contracts with its own customers that provide a similar remedy for FCA in the event that its customers are in default. Specifically, if an FCA



*Id*. at ¶ 139 (emphasis added).

## SUMMARY JUDGMENT IS REQUIRED

**A.    Summary Judgment in VistaJet's Favor is Warranted on Both Parties' Breach of Contract Claims**

      *i.    FCA Breached the Parties' Written Agreements*

When SoftBank, one of VistaJet's most important customers, requested permission to assign a block of unused flight hours to FCA, VistaJet was concerned that its highly confidential commercial "terms, conditions, et cetera," could end up being disseminated "in the marketplace." *Id*. at ¶ 37. To assuage VistaJet's concerns, FCA (mis)represented that it intended to resell the hours only to a limited "stable of clients," and executed written contracts explicitly agreeing that: (a) the existence of its agreement with VistaJet and all related commercial terms were confidential and could not be disclosed without VistaJet's prior written consent; (b) the flight hours it obtained could only be resold to up to eight customers pre-approved by VistaJet, which was permitted to withhold approval for any reasonable reason, including any customer's status as an existing VistaJet client; and (c) no partnership or other similar business relationship existed between the

parties. *Id*. at ¶¶ 44-46, 131.

FCA breached all of these provisions and the underlying intent of the parties' written agreements in several different ways, including by disseminating a marketing brochure for a product dubbed "Insight with Vista." *Id*. at ¶¶ 93-94. In that brochure, for example, FCA not only prominently infringed VistaJet's intellectual property and implied the existence of a nonexistent partnership with VistaJet, but it also disclosed VistaJet's confidential commercial terms to over one hundred third parties—including bankers with access to ultra-high-net-worth individuals, private aviation brokers, and even VistaJet's own customers—without ever seeking or obtaining VistaJet's pre-approval or written consent. FCA went so far as to falsely promote that VistaJet had approved the "Insight with Vista" program and targeted VistaJet's existing clients, encouraging them to breach their agreements with VistaJet to obtain better pricing and service with FCA. *Id*. at ¶¶ 95-122; *accord id*. at ¶¶ 123-130.

Under these circumstances, FCA cannot "raise a trial issue of fact as to whether [it] violated the nondisclosure provision of the [parties'] agreement[s]." *Jackson Heights Care Ctr., LLC v. Bloch*, 39 A.D.3d 477, 479 (N.Y. Sup. Ct. App. Div. 2007); *accord Randall Benderson & Benderson Dev. Co. v. N.W. Savings Bank*, 2017 WL 4652707, at *4 (W.D.N.Y. Oct. 17, 2017) ("[FCA] has not raised an issue of material fact that would enable a reasonable jury to conclude that" its illicit "disclosure[s] w[ere] not in violation of the Confidentiality Agreement"). After all, the "primary objective in contract interpretation is to give effect to the intent of the contracting parties," which is best determined by "what they say in their writing." *Lavazza Premium Coffees Corp. v. Prime Line Distributors Inc.*, 575 F. Supp. 3d 445, 470 (S.D.N.Y. 2021); *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018, 594 N.E.2d 918, 919 (1992). And here, VistaJet and FCA could not have been clearer in defining the limits of FCA's authority to

resell its flight hours to up to eight potential customers pre-approved by VistaJet. Specifically, FCA was not only prohibited from implying the existence of a partnership with VistaJet in general, but it was also prohibited from disclosing the existence of its assignment, including any related legal and commercial terms of VistaJet's program in particular. *Id.* at ¶¶ 44-45; *accord id.* at ¶ 46 ("[FCA] agrees not to disclose the legal and commercial terms of this Program to any third party without VistaJet['s] prior written approval").

Contrary to the plain language of the parties' written agreements, FCA argues that it "believed" or "felt like" its contractual right to resell the hours to up to eight customers trumped all of its other contractual obligations. *Id.* at ¶ 115. But FCA is misguided. All of the contractual provisions can be comfortably harmonized with one another without construing a single contractual provision (e.g., granting FCA a restricted right to resell flight hours) in a way that negates several interlocking contractual obligations that it owed to VistaJet (e.g., preserving VistaJet's confidential commercial information). At the outset, none of these issues would exist if FCA had been truthful in its pre-contractual negotiations with VistaJet and actually had an existing "stable of clients" preparing to take delivery of aircraft who were likely interested in purchasing the flight hours. *Id.* at ¶¶ 36, 53, 56. But, even if FCA did not have clients at the ready, there is no excuse for FCA's conscious decision to breach its obligations and communicate with the wider aviation market in a manner that caused the most harm to VistaJet simply because it presented the most lucrative opportunity for FCA.

There are countless ways that FCA could have approached this predicament of its own making. To take one possibility, for example, FCA could have complied with the parties' agreements by first identifying the potential customers who might be interested in purchasing the flight hours and then seeking VistaJet's "prior approval in writing" to disclose the relevant

agreements and commercial terms to those potential customers under non-disclosure agreements, just as SoftBank did when it sought to assign its flight hours to FCA. Or, FCA could have complied with the parties' agreements by "white labeling" the availability of flight hours without advertising a nonexistent partnership with VistaJet, and then requesting VistaJet's permission to disclose the relevant agreements and commercial terms to any interested customers who inquired about the pricing terms. And, if none of these options or the numerous alternatives were sufficient, then FCA could have approached VistaJet to propose and negotiate any amendments to the relevant contracts. But the one thing that FCA was not entitled to do was to flagrantly breach the parties' agreements designed to protect VistaJet on the grounds that doing so would be easier or cheaper for FCA.

Only VistaJet offers an interpretation of the parties' written agreements that gives effect to each provision, while FCA urges a competing interpretation which violates "a cardinal maxim of contract interpretation" by rendering several "provision[s] meaningless." *Baum v. Cnty. of Rockland*, 337 F. Supp. 2d 454, 467 (S.D.N.Y. 2004); *accord Frontline Comm. Intern., Inc. v. Sprint Comm. Co. L.P.*, 178 F. Supp. 2d 432, 436 (S.D.N.Y. 2001) ("[T]he contract must be interpreted so as to give meaning to every provision"). With the benefit of hindsight, FCA hopes to add, delete, or modify several contractual terms designed to protect VistaJet so that FCA might more easily sell the flight hours that it was assigned. But that is not the product of the parties' bargain, which FCA is powerless to rewrite "in the guise of interpreting a contract." *Buckingham v. Buckingham*, 126 A.D.3d 553, 557, 3 N.Y.S.3d 921, 923 (1st Dept. 2015); *accord Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992) (internal citations omitted) ("A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon

the facts of a given case"); *Lilly v. City of New York*, 934 F.3d 222, 235–36 (2d Cir. 2019)

("[C]ourts must take care not to alter or go beyond the express terms of the agreement").

       *ii.*    <u>*FCA's Triggered an "Event of Default" Excusing VistaJet's Further Performance*</u>

After FCA committed several material breaches of the parties' written agreements, it

exacerbated the harm to VistaJet, triggering a default that FCA has not cured—or even attempted

to cure—to this day. Under these circumstances, FCA's ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████ SUF at ¶ 152. Thus, contrary to FCA's complaint, it is indisputable that VistaJet

**did <u>not</u> breach** any agreement between the parties by refusing to continue doing business with

FCA while it remained in breach. Rather, VistaJet merely **enforced** the default provisions of the

parties' written agreement, warranting the entry of summary judgment in VistaJet's favor on

FCA's breach of contract claim.

       Given that FCA's material breach "relieved or excused [VistaJet] "from its further

performance obligations" as a matter of law, FCA is in a particularly poor position to challenge

VistaJet's reliance on the "Event of Default" provisions in the parties' written agreement under

which it gave FCA notice of its breach and an opportunity to cure it. *Olin Corp. v. Ins. Co. of N.*

*Am.*, 218 F. Supp. 3d 212, 224 (S.D.N.Y. 2016) (quoting *Wechsler v. Hunt Health Sys., Ltd.*, 330

F. Supp. 2d 383, 414 (S.D.N.Y. 2004)); *accord Chapman v. Davis*, 165 N.Y.S.3d 818, 826-27

(N.Y. Just. Ct. 2022) ("Where a party has materially breached the contract, the other party

may . . . suspend its own further performance of the contract"). While at least some of FCA's

breaches—including the dissemination of VistaJet's confidential commercial information—

might have proven impossible to cure, it is undisputed that FCA has not made **any** effort to attempt to cure **any** breach, and instead thumbed its nose at VistaJet's cease-and-desist communications.

For instance, after VistaJet notified FCA that it had unlawfully divulged its confidential commercial information to hundreds of third parties without seeking or obtaining VistaJet's consent, FCA refused to even provide a list of the recipients of the offending marketing materials, hiding the ball for months until this Court compelled it to produce evidence of its illicit disclosures. *See* SUF at ¶ 153. Nor did FCA agree to take any other requested remedial measures, and instead continued to disseminate its offending marketing brochure. *Id*. at ¶¶ 143-146. Under these stark circumstances, VistaJet properly exercised the contractual rights applicable in an ongoing "Event of Default" scenario, which were produced in arms-length negotiations between equally sophisticated parties represented by independent counsel. *See The Edward Andrews Group, Inc. v. Addressing Servs. Co.*, 2005 WL 3215190, at *6 n. 3 (S.D.N.Y. Nov. 30, 2005) (internal quotation marks and citations omitted) ("When evaluating a liquidated damages provision, a court must also give due consideration to whether the parties were sophisticated and represented by counsel, the contract was negotiated at arms-length between parties of equal bargaining power, and . . . freely contracted to").

Any further analysis of the "Event of Default" procedures is rendered academic because FCA has conceded the reasonableness of the relevant contractual provision by incorporating a similar—albeit far more onerous—provision in their own "Insight with Vista" contracts. To be clear, FCA copied most of the confidential VistaJet Program word-for-word in creating contracts with its customers. But not this clause. Under VistaJet's contract with FCA, an "Event of Default" merely prohibits FCA from using its flight hours, which are gradually reduced on a pro rata basis,

for as long as FCA allows its default to continue. But, under FCA's corresponding contracts with their own customers, a breach of ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ SUF at ¶ 139 (emphasis added). And, FCA's CEO notably admitted under oath that FCA's similar—but more draconian—liquidated damages provision which it includes in its contracts with its own customers is commercially reasonable. *See id.* at ¶ 140. Thus, prohibiting FCA from using its flight hours during an "Event of Default" and steadily reducing the availability of its remaining hours while it remains in default not only represents a reasonable method of estimating and ameliorating the harm to VistaJet, but it is also an exceedingly lenient one from FCA's perspective, given its concession that the immediate forfeiture of all of its flight hours upon a material breach would have been reasonable. Thus, there is no genuine issue of material fact that it is reasonable to hold FCA to its agreement to gradually forfeit a portion of its flight hours while it remains in default, abstains from curing its default, and exacerbates the harm by continuing to disseminate VistaJet's confidential information.

If any further analysis were necessary, FCA cannot possibly sustain its burden, as the "party who contests the liquidated damages clause," to "demonstrate either that damages flowing from" its breach "were readily ascertainable at the time" of contracting, or that the liquidated damages provided in the contract are "conspicuously disproportionate to these foreseeable losses." *Jackson Heights Care Ctr., LLC v. Bloch*, 39 A.D.3d 477, 478, 833 N.Y.S.2d 581 (2007) ("It is well established" that the enforceability of a liquidated damages clause "is a question of law, giving due consideration to the nature of the contract and the circumstances"). To the contrary, there are innumerable conceivable ways in which FCA's breaches were expected to cause severe harm that might not be susceptible to an exact computation—including by divulging

VistaJet's confidential commercial terms to create a price anchor in the market; by exceeding the limits of VistaJet's pre-approval to steal VistaJet's existing clients; and by implying the existence of a nonexistent partnership to cause widespread customer confusion about the origin and source of the services provided. Thus, the parties' "Event of Default' provision generates a reasonable estimate of the significant harm that FCA's expected breaches would impose on VistaJet in the form of reputational harm, lost sales, and diminished market share that might be indeterminate or difficult to calculate with precision. *Strohl Sys. Group, Inc. v. Fallon*, 2006 WL 2828997, at *7 (E.D. Pa. Sept. 29, 2006) (holding that liquidated damages provision was valid and enforceable where a breach of confidentiality resulted in significant damages).

By way of illustration, the number of VistaJet clients that did not renew or prematurely terminated their Program Agreements more than doubled in 2022, which likely stems from FCA's breaches. *See* SUF at ¶ 157. And, as FCA's **ongoing** illicit disclosures continue to trickle through the aviation industry, VistaJet faces potentially incalculable future damages. *Id*. at ¶¶ 154-163. Presumably, FCA would challenge the existence and extent of VistaJet's damages which could only be resolved through burdensome, expensive, and time-consuming proceedings that the parties deliberately preempted by executing a reasonable "Event of Default" provision instead. *See X.L.O. Concrete Corp. v. John T. Brady & Co.*, 104 A.D.2d 181, 183–84, 482 N.Y.S.2d 476, 479 (1984) (where damages "are uncertain, or difficult, if not incapable, of ascertainment, then a provision liquidating them in advance of loss will be enforced, if the amount liquidated bears a reasonable proportion to the probable loss."); *L & L Wings, Inc. v. Marco-Destin Inc.*, 756 F. Supp. 2d 359, 364 (S.D.N.Y. 2010) ("Liquidated damages clause[ ]" is "suited to [such] factual situations where there is uncertainty concerning the measure of damages").

Nor is the parties' "Event of Default" provision in any way disproportionate to the

expected harm. Rather, VistaJet operates a traditional membership model that represents one component of a multi-billion-dollar network of affiliated entities that requires a consistent flow of revenue and costs on a monthly basis to ensure the guaranteed availability of private flights to a global client base. *See* SUF at ¶ 163. To the extent that a VistaJet client perpetrates a material breach that prevents it from using its flight hours, it is necessary and appropriate for the client to forfeit those hours. Otherwise, VistaJet and its corporate affiliates would be penalized, as defaulting clients could hoard their flight hours while remaining in breach, preventing VistaJet from booking any revenue and effectively holding VistaJet hostage to the breaching client. *Id*. Thus, a formula entailing the gradual and proportional "forfeiture of . . . other property[,]" that could "vary with the value and length of the breach," reflects these unique considerations and the parties' "good[-]faith effort . . . to estimate at the time of contracting the damage which would flow from a breach." *Bradford v. New York Times Co.*, 501 F.2d 51, 57 (2d Cir. 1974).

### B.   FCA Infringed VistaJet's Copyrights In Five Photographs, And Summary Judgment is Required as To VistaJet's Copyright Infringement Claim

VistaJet is entitled to summary judgment of its copyright infringement counterclaim because there is no material issue of fact that (i) it owns valid copyrights in the Infringed Photographs; and (ii) FCA copied, distributed, and publicly displayed the Infringed Photographs without authorization. *Frye v. Lagerstrom*, No. 20-3134, 2021 WL 4022695, at *3 (2d Cir. Sept. 3, 2021) (explaining that the two elements of copyright infringement are (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original and affirming summary judgment on plaintiff's copyright claim).

The five Infringed Photographs were registered with the U.S. Copyright Office in 2022, within five years of their first publication on March 31, 2021, and therefore presumed valid under 17 U.S.C. § 410(c). *See* SUF at ¶¶ 74-76. VistaJet is the owner of exclusive rights in the Infringed

Photographs in the U.S.—including the right to reproduce, distribute, and display the Infringed Photographs in the U.S., the rights infringed by FCA—and also has the right to sue for past, present, and future infringements through an exclusive license from its affiliate, VistaJet International Limited ("VJIL"). *Id*. at ¶¶74-84. FCA's copying and distribution the Infringed Photographs is undisputed. FCA admits that it copied the Infringed Photographs (and others) from VistaJet's website without permission. *Id*. at ¶¶ 100-108. The Infringed Photographs were features in FCA's promotional brochures, which FCA continued to distribute to third parties even after VistaJet demanded that it cease use of VistaJet's intellectual property. *Id.* at ¶¶ 143-146. Since, as discussed below, FCA's affirmative defenses to this claim all fail, summary judgment for VistaJet is proper.

### C.  FCA's Copyright Defenses Are Improperly Pled And Meritless

VistaJet moves for summary judgment on FCA's sixth, twelfth, thirteenth, and fourteenth defenses because they are insufficiently pled[1] and FCA cannot demonstrate any factual dispute.

FCA's **sixth defense** asserts that VistaJet did not own (i) the Infringed Photographs or (ii) any right to assert claims arising out of FCA's use of those photographs during the time FCA used the photographs. Dkt. 77 ¶ 105. This purported defense fails because FCA has no evidence to rebut the chain of title of the Infringed Photographs and disregards established law concerning the transfer of the right to sue for past and present infringement claims. Simone Migliaccio, the photographer, informally assigned the Infringed Photographs to VJIL in March 2021 and later confirmed the assignment in writing. *See* SUF at ¶¶ 77-81. This meets the requirements for a transfer of copyright ownership under 17 U.S.C. § 204. *See Arthur A. Kaplan Co. v. Panaria Int'l, Inc.*, 1998 U.S. Dist. LEXIS 14360, at *6 (S.D.N.Y. Sept. 10, 1998) ("a writing, even if signed

---

[1] *See GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 96 (2d Cir. 2019) (*Twombly* plausibility standard applies to pleading affirmative defenses).

after litigation commenced, can serve to satisfy the requirements of § 204(a)"); *see also Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir. 1982) (explaining that a copyright owner's "later execution of a writing which confirms the [transfer] agreement" satisfies the writing requirement and "need not be made at the time when the [exclusive] license is initiated").[2] VJIL then confirmed its grant of an exclusive copyright license to VistaJet in the Exclusive Copyright License Agreement. *See* SUF at ¶ 82. Even if VJIL owned the copyrights at the time of FCA's infringement, VJIL expressly granted VistaJet the right to sue for accrued claims of infringement. *Id.* at ¶ 83. "[P]ersons who have been granted exclusive licenses by owners of copyrights" may sue for infringement of their exclusive rights. *Eden Toys*, 697 F.2d at 32 (citing 17 U.S.C. § 501(b)); *accord* 17 U.S.C. § 101 (defining "transfer of copyright ownership" to include an "assignment" or "exclusive license"); *Godinger Silver Art Co. v. Int'l Silver Co.*, No. 95 Civ. 9199, 37 U.S.P.Q.2d 1453, 1995 WL 702357, at *4 (S.D.N.Y.1995) ("if, as here, accrued causes of action are expressly included in the assignment, then the assignee can prosecute them," even if the rights were conveyed subsequent to the commencement of the action).

FCA's **twelfth defense**, that it had no intent to infringe VistaJet's copyrights and that its use "was innocent" (Dkt. 77 ¶ 111) is not a cognizable affirmative defense. "Like trademark infringement, copyright infringement is a strict liability offense, meaning 'intent or knowledge is not an element of infringement.'" *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 156 (E.D.N.Y. 2016) (quoting *Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807

---

[2] To the extent that FCA is challenging Mr. Migliaccio's copyright assignment to VJIL, it does not have standing to do so because the record demonstrates that Mr. Migliaccio and VJIL intended to transfer ownership of the copyright in March 2021. *See* SUF at ¶¶ 79-81. "Courts have repeatedly held that where a transferor and transferee of a copyright agree that the transfer was valid, an alleged infringer may not use the writing requirement as a sword to avoid liability." *Russian Ent. Wholesale, Inc. v. Close-Up Int'l, Inc.*, 767 F. Supp. 2d 392, 402 (E.D.N.Y. 2011), *aff'd*, 482 F. App'x 602 (2d Cir. 2012); *see, e.g., Arthur A. Kaplan Co.*, 1998 U.S. Dist. LEXIS 14360 at *6 (refusing to analyze the validity of assignment agreements at the behest of the defendant where the assignor and assignee were in agreement that an assignment had taken place).

F.2d 1110, 1113 (2d Cir. 1986)). Further, "[i]nnocence is only significant to a trial court when it fixes statutory damages." *Fitzgerald Publ'g Co.*, 807 F.2d at 1113. VistaJet requests its actual damages, not statutory damages under the Copyright Act. *See* Dkt. 61.

FCA's **thirteenth defense** asserts that VistaJet is equitably estopped from asserting copyright infringement because the Assignment and Assumption Agreement and Addendum dated April 1, 2022 entitled FCA to use the Infringed Photographs and/or provided FCA with an implied license. Dkt. 77 ¶ 112. Both theories fail as a matter of law. "To prevail on an estoppel defense in the copyright context, a defendant must show that: (1) plaintiff had knowledge of the defendant's infringing conduct; (2) plaintiff either (a) intended that defendant rely on plaintiff's acts or omissions suggesting authorization, or (b) acted or failed to act in such a manner that defendant had a right to believe it was intended to rely on plaintiff's conduct; (3) defendant was ignorant of the true facts; and (4) defendant relied on plaintiff's conduct to its detriment." *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 321 (2d Cir. 2022). When VistaJet learned of FCA's infringing conduct, it sent a cease-and-desist letter demanding that FCA cease use of its intellectual property. *See* SUF at ¶¶ 141-142. Neither this letter nor any other evidence in the record comes close to VistaJet "suggesting authorization."

FCA also cannot meet its burden of providing evidence of an implied license. While the Second Circuit has "not yet ruled on the precise circumstances under which an implied non-exclusive license will be found," both the narrow test and permissive test used by courts in this circuit require a "meeting of the minds between the parties to permit the particular usage at issue." *ABKCO Music*, 50 F.4th at 320.[3] FCA cannot prove an implied license under either test because

---

[3] Under the narrow test, an implied license may be found only "where one party created a work at the other's request and handed it over, intending that the other copy and distribute it," and under the more permissive test, "consent may be inferred based on silence where the copyright holder knows of the use and encourages it." *Id.* (cleaned up). The undisputed fact that the Assignment and Assumption Agreement and Addendum were executed a year *after* the

there is no evidence that the parties ever discussed FCA's use of the Infringed Photographs, much less that there was a meeting of the minds on FCA's use of them in the Brochure.

FCA's **fourteenth defense** asserts that VistaJet waived (i) any copyright and proprietary interest in the Infringed Photographs and (ii) the right to require any third party to obtain VistaJet's consent to use its photographs. Dkt. 77 ¶ 113. "In order to establish waiver under New York law, [FCA] must show intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it. The conduct constituting a waiver must be clear, unmistakable and without ambiguity." *O'Neil v. Ratajkowski*, 563 F.Supp.3d 112, 135 (S.D.N.Y. 2021) (internal citations omitted). As an initial matter, this defense is deficiently pled because it contains no factual allegations. In any event, there is no evidence of a clear and unmistakable waiver of copyright by VistaJet. To the contrary, the record shows that VistaJet carefully controls use of its IP and enforces against infringing use of its copyrighted works. *See* SUF at ¶¶ 85-92. VistaJet's prompt letter to FCA demanding that FCA cease all use of its IP upon discovery of the Brochure is just one example. *Id.* at ¶¶ 141-142. FCA also cannot show that VistaJet intended to relinquish its copyrights. VistaJet's website from which FCA copied the Infringed Photographs clearly states that duplication of copyrighted images is not permitted without VistaJet's express permission. *Id.* at ¶¶ 91-91. VistaJet also requires its "partners" (which FCA is not) to agree to terms and conditions governing use of VistaJet's intellectual property, which may be revoked at any time. *Id.* at ¶¶ 86-89.

D.    **Summary Judgment is Proper as to FCA's Claim for Tortious interference.**

While FCA pleaded its tortious interference claim in the most conclusory manner possible, FCA's sworn interrogatory answers provide two factual bases for FCA's claim for tortious

---

creation of the Infringed Photographs affirmatively belie the existence of an implied license to FCA under the narrow test, and there is no evidence of VistaJet's encouragement of FCA's use of the Infringed Photographs.

interference with contract. But none of these bases saves FCA's claim on summary judgment.

*First*, FCA alleges that by declaring an Event of Default, VistaJet has "prevent[ed] FAC [sic] from fulfilling its obligations under its contracts with its customers[,]" DE 1-1 ¶ 34, and "damaged FCA's existing contractual relationship with" its "three customers." SUF at ¶ 167. However, "[FCA] do[es] not assert, let alone prove," that any of its clients "breached any contract with [FCA]." *Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.*, 83 F. Supp. 2d 384, 391 (S.D.N.Y. 2000). Rather, FCA asserts that *it* (FCA) was "forced to breach [*its*] agreements with" its clients, but "[t]hat is not the fact pattern contemplated by the tortious interference doctrine known as inducing breach of contract, since [FCA's] *own* breach of contract cannot cause it any damage." *Id*. (emphasis added). "While [VistaJet's] act of exercising a contract right might have rendered or caused [FCA] unable to perform its obligations to [its customers], it cannot be said that [VistaJet] acted maliciously or illegally, nor is there evidence to the contrary." *Wilmington Tr. Co. v. Strauss*, 831 N.Y.S.2d 357 (N.Y. Sup. Ct. 2006), *aff'd*, 847 N.Y.S.2d 21 (2007); *accord Bekhor v. Josephthal Group, Inc.*, 96 CIV. 4156 (LMM), 2000 WL 1521198, at *8 (S.D.N.Y. Oct. 13, 2000) (granting summary judgment and dismissing tortious interference claim, because the mere exercise of a contractual right does not provide support for a tortious interference claim).

*Second*, FCA alleges that "VistaJet's actions denied FCA the ability to resell" hours to "new customers" and "make new agreements" with "potential new customers . . ." SUF at ¶ 167. But FCA's "general allegation of interference with customers without any sufficiently particular allegation of interference with a specific contract or business relationship" is insufficient, and even if FCA had pointed to evidence of VistaJet's interference with any specific customers, FCA utterly failed to show that VistaJet's purported actions "amount[ed] to a crime or an independent tort[.]" *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) (holding that defendant was

entitled to summary judgment on tortious interference claim, where plaintiff failed to show that alleged interference was criminal or otherwise independently tortious). Given that "[VistaJet] has acted with a permissible purpose, such as normal economic self-interest, wrongful means have not been shown, even if [VistaJet] was indifferent to [FCA's] fate." *Id*. (internal citations omitted). Accord *Nassau Diagnostic Imaging & Radiation Oncology Associates, P.C. v. Winthrop-Univ. Hosp.*, 197 A.D.2d 563, 564, 602 N.Y.S.2d 650, 651 (1993) (granting summary judgment and dismissing tortious interference claim, where "plaintiff and the defendants [were] competitors" and "defendants' actions were motivated by, inter alia, an economic self interest[,]" which "cannot be characterized as malicious.").

WHEREFORE, VistaJet respectfully requests that this Court enter partial summary judgment in its favor with respect to its counterclaims for breach of contract and copyright infringement (DE 61 at Counts II & VI), and with respect to FCA's claims for breach of contract and tortious interference (DE 1-1 at Counts I, II & III).

Dated: May 26, 2023

Respectfully submitted,

**AXS LAW GROUP, PLLC**
2121 NW 2nd Avenue, Suite 201
Miami, FL 33127
Tel:  305.297.1878

By:  */s/ Jeffrey W. Gutchess*
Jeffrey W. Gutchess
jeff@axslawgroup.com
Bernardo N. de Mello Franco
bernardo@axslawgroup.com
eservice@axslawgroup.com

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the forgoing was served via CM/ECF on counsel of record of in this action on this 26th day of May, 2023.

*/s/ Jeffrey W. Gutchess*
Jeffrey W. Gutchess