# EXHIBIT 91

Confidential

```
 1                   JOSEPH ABARNO

 2            C O N F I D E N T I A L

 3           UNITED STATES DISTRICT COURT

 4           SOUTHERN DISTRICT OF NEW YORK

 5               CASE NO. 1:22-cv-6206

 6    - - - - - - - - - - - - - - - - - - -)

 7   PIONEER BUSINESS SERVICES, LLC,

 8   d/b/a FOUR CORNERS AVIATION SERVICES,

 9           Plaintiff(s),

10       vs.

11   VISTAJET US, INC.,

12           Defendant(s).

13    - - - - - - - - - - - - - - - - - - -)

14        DEPOSITION UNDER ORAL EXAMINATION OF

15                   JOSEPH ABARNO

16            DATE: January 24, 2023

17       REPORTED BY:  MICHAEL FRIEDMAN, CCR

18

19

20

21

22

23

24

25   JOB NO. 221076
```

Case 1:22-cv-06206-ALC-BCM   Document 147-38   Filed 05/26/23   Page 3 of 13
Confidential
Page 22

```
 1                    JOSEPH ABARNO
 2           To prepare for your deposition
 3    today, over the last week or two did you
 4    review any documents?
 5        A    Yes.
 6        Q    What documents did you review?
 7        A    I reviewed five prospecting e-mails
 8    that were sent on my behalf as well as some
 9    internal communication regarding the account,
10    but that's it.
11        Q    All right.  So when you say five
12    prospecting e-mails, do you recall to whom
13    those prospecting were sent?
14        A    Yes, those e-mails were sent to
15    roughly 1,000 to 3,000 people at a single
16    time.
17        Q    Okay.  And did you see any that
18    were -- of those five prospecting e-mails,
19    did you see the -- any copies of those
20    e-mails with the recipients on them?
21        A    Yes.
22        Q    Which recipients were on the
23    e-mails that you saw?
24        A    I don't remember the name, but the
25    one we reviewed was at a Coca-Cola e-mail
```

 1                     JOSEPH ABARNO

 2    address.

 3        Q    Okay.  Were all five of them for

 4    Coca-Cola e-mail addresses or just one of the

 5    five?

 6        A    I don't remember specifically.  I

 7    do remember at least one.

 8        Q    Okay.

 9             Then you say you looked at some

10    documents regarding the account.  What did

11    you mean by the account?

12        A    Internal communication from our

13    member services team speaking on how -- how

14    they entered the account within the

15    GlobalView system, but nothing that I had any

16    part of.  Didn't really understand what was

17    going on there.

18        Q    When you say the account, what

19    account are you referring to?

20        A    It was just speaking of GlobalView.

21    I'm not even sure which account they were

22    speaking of.  I just know that I was cc'd on

23    that e-mail.

24        Q    Was it relating to the account that

25    FCA had after acquiring the SoftBank hours,

```
 1                   JOSEPH ABARNO
 2    I wouldn't know.
 3         Q    Did you have access as part of your
 4    job to GlobalView?
 5         A    I had limited access, but there was
 6    nothing that I could do with that system.
 7         Q    Did you have a look at or it
 8    examine GlobalView with respect to any of the
 9    three parties whom I just mentioned,
10    Coca-Cola, EF Falcon, and the Dalio family
11    office?
12         A    No.
13              MR. HAVELES:  Let's take a short
14         break.  Then we will come back to finish
15         up.
16              (Whereupon a discussion was held
17         off the record.)
18              THE VIDEOGRAPHER:  The time is
19         10:33 a.m.  We're off the record.
20              (Brief recess taken.)
21              THE VIDEOGRAPHER:  Stand by,
22         please.
23              MR. HAVELES:  Okay.
24         Q    Mr. Abarno, during the break did
25    you recall anything that I asked you about
```

1                    JOSEPH ABARNO
2     region, so it was tagged to my name for
3     prospecting e-mail and call purposes.
4          Q    Okay.  It says you e-mailed their
5     team on July 19.  What e-mail did you send to
6     the MJX Asset team on or about July 19?
7          A    I don't know.  It could have been a
8     marketing e-mail or just some sort of
9     prospecting e-mail.
10         Q    At or around this time, were you
11    aware that the Dalio family office and
12    Mr. Dalio were booking -- were using VistaJet
13    flight hours through arrangements made by FCA
14    during the preceding months?
15         A    No, I had no knowledge.
16         Q    Did anyone ever ask you after July
17    or on or about July -- June 24, 2022 or
18    thereafter to reach out and contact anyone at
19    the Dalio family office or Bridgewater
20    Associates about selling them VistaJet hours?
21         A    No.
22         Q    Okay.  Going on in your e-mail in
23    that same paragraph you say, "I'm surprised
24    this is not linked to my existing account."
25              Why were you surprised?

Page 71

1           JOSEPH ABARNO

2       A    Yes.

3       Q    Okay.  Was a copy of this e-mail

4    provided to you by counsel?

5       A    Yes.

6       Q    Okay.  The address -- this

7    particular e-mail is addressed to Mr. Quincy

8    at Coca-Cola?

9       A    Yes.

10      Q    Do you know where you obtained

11   Mr. Quincy's direct e-mail?

12      A    I do not.

13      Q    Okay.  Do you know whether

14   SalesForce had an entry for Mr. Quincy?

15      A    SalesForce did have the entry for

16   Mr. Quincy.

17      Q    Do you know when that entry was

18   made into SalesForce?

19      A    I do not know.

20      Q    Okay.  Then the first paragraph

21   after the Saltation, it states, "I would like

22   to introduce myself as your VistaJet point of

23   contact for all of your upcoming travel

24   requirements and can assist at your earliest

25   convenience."

Page 72

1                JOSEPH ABARNO
2          Why were you Mr. Quincy's point of
3    contact, or how was it that you were
4    Mr. Quincy's point of contact?
5        A    This is a mass e-mail that went to
6    anywhere from 1,000 to 3,000 people at a
7    single time.  This was just part of how we
8    prospected.
9        Q    So you would tell someone at the
10   point of contact whether or not they had a
11   prior relationship?
12       A    Correct.
13       Q    And at the time that this e-mail
14   was sent to Mr. Quincy, do you know whether
15   Mr. Quincy had ever used directly VistaJet
16   for flight hours?
17       A    No, I have no idea.
18       Q    Okay.  Did you have any discussions
19   with anyone at the time of this e-mail about
20   including Coca-Cola and Mr. Quincy in the
21   e-mail exchange blast that you sent out?
22       A    No.
23       Q    So you say it was something between
24   a thousand and 3,000 addressees.
25            Did you do anything in connection

Page 75

1              JOSEPH ABARNO
2          MR. HAVELES:  Christina, please let
3      us know when --
4          MS. van SLYCK:  Yes.  It's been
5      submitted.
6          MR. HAVELES:  Okay.
7      Q    If you can open up Exhibit 9,
8  please, Mr. Abarno.
9      A    All right.  The e-mail is in front
10 of me.
11     Q    Okay.  Is this an e-mail that you
12 reviewed in connection with preparing for
13 your deposition?
14     A    Yes.
15     Q    And this was provided to you by
16 counsel?
17     A    Yes.
18     Q    Okay.  Now, was this e-mail part of
19 another e-mail blast to many individuals?
20     A    Yes.
21     Q    In this e-mail it says, Dear James:
22 Request an on-demand quote for your next
23 flight on VistaJet's identically-designed
24 fleet of Global and Challenger aircraft
25 inclusive of a British Butler -- let me read

```
 1                    JOSEPH ABARNO
 2   that again.
 3              "Request an on-demand quote for
 4   your next flight on VistaJet's
 5   identically-designed fleet of Global and
 6   Challenger aircraft inclusive of a British
 7   Butler Institute-trained cabin hostess, fine
 8   dining and all taxes and fees."
 9              When you sent that request out to
10   or that suggestion out to Mr. Quincy, did you
11   have any -- did you have any discussions with
12   anyone prior to sending that communication to
13   Mr. Quincy?
14        A    No.
15        Q    And with respect to that -- this
16   e-mail, is there any reason why you did not
17   allude to the blast you sent two weeks
18   earlier on May 27th?
19        A    Can you rephrase that?
20        Q    Sure.
21              Is there any reason why you did not
22   make reference to the May 27 e-mail that you
23   sent to Mr. Quincy two weeks earlier?
24        A    No, there's no reason.  There's
25   about five e-mails that are automated that
```

1          JOSEPH ABARNO
2  get sent out every so many days, and this
3  looks like it's --
4       Q    Is there any kind of filter or
5  check to be sure that you don't send out so
6  many e-mails that it can be perceived by the
7  recipient as being harassing?
8       A    Can you define harassing?
9       Q    Pardon me?
10      A    Can you define harassing?
11      Q    Yeah, where the recipient might
12 think:  You're harassing me or bothering me
13 with unnecessary spam e-mails, when you're
14 dealing with someone who is fairly senior in
15 a corporate organization.
16      A    Yeah.  All they had to do was
17 reply, "Unsubscribe", and I believe there's
18 also a -- I believe there's a function on the
19 e-mail that allows them to unsubscribe as
20 well.
21      Q    Okay.  So unless and until they
22 unsubscribe, you just blast them with
23 e-mails.
24           Is that the idea?
25      A    Not necessarily.  There's always a

```
 1                  JOSEPH ABARNO
 2   time where, you know, maybe years down the
 3   line people could, you know, circle back with
 4   you, but this --
 5       Q    Okay.  Let me -- I'm sorry.  I keep
 6   on cutting you off.  My apologies.
 7       A    That's fine.
 8       Q    Did you have anything that you
 9   wanted to add?  I'm sorry for cutting you
10   off.
11       A    Yeah.  There's typically anywhere
12   from three to five e-mails that are sent in,
13   you know, a periodic time frame.
14            And after that runs its course we
15   don't start a whole new one.  We give them
16   time to breathe and give them time if they
17   want to reply or not.
18       Q    Okay.  All right.
19            Now, let me ask you --
20            MR. HAVELES:  Let's mark as Exhibit
21       10 -- Christina, can you put it in the
22       folder, please, an e-mail dated 23
23       June 2022 from Joseph Abarno to James
24       Quincy.
25            It bears the Bates numbers VJ 9022
```

```
 1                    JOSEPH ABARNO

 2              C E R T I F I C A T E

 3           I, MICHAEL FRIEDMAN, a Certified Court

 4   Reporter and Notary Public, qualified in and for

 5   the State of New Jersey do hereby certify that

 6   prior to the commencement of the examination JOSEPH

 7   ABARNO was duly sworn by me to testify to the truth

 8   the whole truth and nothing but the truth.

 9           I DO FURTHER CERTIFY that the foregoing

10   is a true and accurate transcript of the testimony

11   as taken stenographically by and before me at the

12   time, place and on the date hereinbefore set forth.

13           I DO FURTHER certify that I am neither a

14   relative of nor employee nor attorney nor counsel

15   for any of the parties to this action, and that I

16   am neither a relative nor employee of such attorney

17   or counsel, and that I am not financially

18   interested in the action.

19

20

21           _Michael Friedman_

22           MICHAEL FRIEDMAN, CCR of the

23           State of New Jersey

24           License No:  30XI00228600

25           Date:  January 31, 2023
```