USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: _3/29/2024_____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **PIONEER BUSINESS SERVICES, LLC,**<br><br>                                    **Plaintiff,**<br><br>                 **-against-**<br><br>**VISTAJET US, INC.,**<br><br>                                    **Defendant.** | **22-CV-06206 (ALC)**<br><br>**OPINION AND ORDER** |

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Pioneer Business Services, LLC d/b/a Four Corners Aviation Services ("Plaintiff" OR "Pioneer") bring this action against Defendant VistaJet US, Inc. ("VistaJet or "Defendants") for declaratory judgment finding that the Plaintiff has no viable claim against Pioneer under the Lanham Act and for copyright infringement as well as for breach of contract and tortious interference with contract in violation of New York state law. ECF No. 1 ("Compl."). Defendant also filed counterclaims against Plaintiff for fraudulent inducement, breach of contract, violations of the Lanham Act, common law trademark infringement, and unjust enrichment. ECF No. 61 ("Counterclaims"). Following discovery both parties filed cross motions for summary judgment as to several of their respective claims. *See* ECF Nos. 142, 148. For the reasons stated below, the Parties' motions for summary judgment and motions to seal are **GRANTED** in part and **DENIED** in part.

## BACKGROUND

### I.    Facts

The following undisputed facts are drawn from the Parties' 56.1 Statements, the documents relied upon therein, the Complaint, and Defendants' Answer and Counterclaims.

### A.  Parties

Plaintiff Pioneer is a Delaware limited liability company which provides private aircraft management, operations, charter, and consulting services.  *See* Compl. ¶ 2; ECF No. 140 ("Pls 56.1 Statement") at ¶ 1.  Defendant VistaJet is a Delaware Corporation that operates a private jet membership program for ultra-high-net-worth individuals.  *See* Compl. ¶3; ECF No. 149 ("Defs 56.1 Statement) ¶ 1; ECF No. 141 ("Def. Mem. Summ. J.) at 2.

### B.  Facts

On April 1, 2020, the financial firm SoftBank entered into a Program Agreement with VistaJet under which SoftBank purchased hundreds of VistaJet private jet hours.  Defs 56.1 Statement ¶¶ 5-6.  Because SoftBank was a larger client and was placing a large order of jet hours, VistaJet offered the bank a special lower hourly flight rate it did not offer on the open market.  *Id.* at ¶ 7.  Section 3.7 of the Program Agreement stated, in relevant part, that SoftBank "agree[d] to not disclose the legal and commercial terms of th[e] Program to any third party without VistaJet US's prior written approval, save to the extent required by law and/or to permit the Member to comply with contractual obligations under this Program."  ECF No. 150-4 ("Franco Decl I") at 7.

In early 2022, SoftBank had yet to use approximately 70% of the flight time it had acquired.  Defs 56.1 Statement ¶ 13.  Around that same time, the bank decided it no longer needed their remaining hours.  *Id.*  Ostensibly hoping to avoid wasting capital on unused private

jet time, SoftBank then approached VistaJet seeking permission to assign the remaining hours to a third party. *Id.* at ¶ 14. Softbank then reached out to Pioneer's CEO to inquire whether they would be interested in purchasing the bank's remaining hours. *Id.* at ¶ 15. At that time and through 2023, Pioneer had only three clients on its "Insight Card" platform which provided consulting and advisory services to clients seeking to compare private jet trips. *See* Franco Decl. I Ex. 13; ECF No 169 ("Pls Counter-Statement") at ¶ 52. What's more, Pioneer's CEO testified that Pioneer did not have a "stable of clients" for VistaJet's hours around the time that SoftBank was looking to offload. Pls Counter-Statement ¶ 53. Yet, either despite or because of this, Pioneer continued its discussions with SoftBank.

Before discussing any particulars of the Program Agreement, SoftBank executed a non-dislosure agreement ("NDA") with Pioneer requiring the parties to "keep confidential and not disclose [one another's] Confidential Information," with confidential information defined as "any information disclosed . . . that is designated as confidential by [the] [d]islcoser, or that, given the nature of the information or the circumstances surrounding its disclosure, should reasonably be considered confidential, including . . . any and all information and material disclosed in connection with the [s]ervices or in the course of the parties' business dealings." Franco Decl. I Ex. 9. Pioneer's CEO believed that the number of hours for sale and purchase price constituted confidential information. Defs 56.1 Statement at ¶ 19. SoftBank also instructed Pioneer's CEO to "ensure" that a potential buyer "sign[] an NDA so as not to share the details of [the] program agreement with third parties without [SoftBank's] consent." *Id.* at ¶ 21.

Following the execution of the SoftBank-Pioneer NDA, Pioneer officials learned of the steeply discounted rate that SoftBank had acquired. *Id.* at ¶ 30. Pioneer's senior leadership then determined that they could potentially flip these jet hours to current and potential clients for a

profit. *Id.* at ¶ 31. Pioneer soon informed SoftBank that they were "considering purchasing" the remaining VistaJet hours. Franco Decl. I Ex. 15; Pls Counter-Statement ¶ 34. A few days later, SoftBank's GC sent an email to Pioneer in which she stated that she "spoke with VistaJet" and that VistaJet would permit SoftBank to "assign the entire Program Agreement to [Pioneer]." *Id.* at ¶ 35. The SoftBank GC went on to state that Pioneer could "have a stable of 4-5 clients that would be approved by VistaJet and would be able to use the hours." *Id.*

Pioneer wasted little time in identifying potential clients. A few days on from the SoftBank GC's email, Pioneer's COO sent an email to a representative from Clay Lacy Aviation ("CLA"), a competitor of VistaJet's, who served as a consultant to Pioneer in which the COO disclosed the outlines of the potential deal with SoftBank. *Id.* at ¶ 23; Pls Counter-Statement at ¶ 23. The email to the CLA consultant included the price at which SoftBank had acquired the hours, how much Plaintiff might purchase the hours for, what they might charge customers, and specific information on jet availabilities. Franco Decl. I Ex. 12. Pioneer's CEO also testified that he "had talked about certain customers" to whom the COO might send elements of the deal to but the two did not discuss what elements of the deal they would or would not divulge to potential customers. Defs 56.1 Statement ¶ 24; Pls Counter-Statement at ¶ 24.

VistaJet's President stated in her testimony that during the tripartite negotiations of SoftBank's assignment of their contract to Pioneer, she rejected the Pioneer CEO's initial request to assign the hours to a potential "double digit[]" number of clients. *See* Franco Decl. I Ex. 3. VistaJet's President went on to state that the parties "must have agreed" to limit Pioneer to assign the remaining hours to eight clients whom Pioneer had previously advised on purchasing aircraft. *Id.* For his part, Pioneer's CEO stated that he made no representation limiting the number of potential clients Plaintiff might market to and that he understood VistaJet's statements were

merely a limitation on "the number of companies or individuals [Pioneer] could sell the hours to."  Pls Counter-Statement at ¶ 36.  Ultimately though Pioneer, VistaJet, and SoftBank did execute the official Program Agreements assignment in April 2022.  Defs 56.1 Statement ¶ 41.

The relevant portions of the Parties' contract are as follows.  Section 8 of the Assignment Agreement states that "[a]s of the Closing Date, [Pioneer] hereby accepts the foregoing assignment, transfer and conveyance of all of SoftBank's rights, title, interests, obligations and liabilities in, to and under the VistaJet Contracts and agrees to assume the performance of the obligations contained in, and to discharge any liabilities pursuant or in relation to, the VistaJet Contracts."  Franco Decl. I Ex. 17.  The referenced "VistaJet Contracts" are those Program Agreements that VistaJet previously had with SoftBank.  *Id.*  Both of these agreements contained confidentiality covenants under which VistaJet and SoftBank (and therefore subsequently Pioneer) "agree[] to not disclose the legal and commercial terms of this Program to any third party without VistaJet US's prior written approval, save to the extent required by law and/or to permit the Member [SoftBank/Pioneer] to comply with contractual obligations under this Program."  *Id.*  These Agreements also state that they "do[] not create a joint venture, partnership or other form of business relationship between the parties . . . ."  Franco Decl. I Ex. 72.  In addition, the Assignment Agreement itself also included a confidentiality provision which stated that "[u]nless otherwise agreed to in writing by the parties hereto, each party agrees that all information contained herein or related to the contents of this Agreement, including the terms and existence of this Agreement, is confidential, and shall not disclose, or permit the disclosure of any of the foregoing, provided that to the extent that disclosure is required by law, rule or regulation or judicial or administrative process, such consent shall not be unreasonably withheld, conditioned or delayed.  For the avoidance of doubt, VistaJet shall treat this Agreement as

confidential subject to the Privacy Policy that governs the VistaJet Contracts."  Franco Decl. I Ex. 17.   Section 2 of the Addendum to the Program Agreements, which was executed contemporaneously to the Assignment Agreement, states that "[i]n the event of any inconsistency between the terms of this Addendum and the terms of the Programs, the terms of this Addendum shall prevail."  Franco Decl. I Ex. 17.  Section 3.4.1 of the Addendum to the Program Agreements, which was executed contemporaneously to the Assignment Agreement states that "Member [Pioneer] shall have the right to resell blocks of hours to third parties under the Program to up to eight (8) different customers during the Term of the Program provided that each such customer is pre-approved by VistaJet, which such approval shall not be unreasonably withheld or delayed."  Pls Counter-Statement at ¶ 44.

The Agreement also defines an "Event of Default" as any "material breach of any . . . provision of this Program, which breach continues for 30 calendar days after written notice is received from the non-defaulting party, unless, within such 30 days, the defaulting party diligently commences a cure of such breach and completes said cure within 60 calendar days of receipt of such notice."  Franco Decl I. Ex. 88.  Finally, there is a liquidated damages provision which states that the breaching party would "not be entitled to use of the Program Aircraft, and the Committed Hours shall be reduced, as liquidated damages and not as a penalty, by an amount equal to one twelfth of the then-current Year's Committed Hours for each 30-day period (or a pro rata portion thereof) that such default persists."  *Id.*

Closely prior to and following the enactment of the Agreements, Pioneer began formulating internal plans to offer the VistaJet hours through its Insight Card program by which Pioneer offers charter services to program participants.  Pls Counter-Statement ¶¶ 56-59.  Pioneer personnel created a marketing deck to promote their new "Insight with Vista" product to

prospective clients. *Id.* at ¶¶ 93-94. The slide deck, entitled "Insight Card with Vista Opportunity," has the plain text "INSIGHT – VISTA OPPORTUNITY" on each body slide. Franco Decl. I Ex. 28. When discussing Pioneer's offer to prospective clients, the slide deck states that "[Pioneer] has contracted with VistaJet US for a block of hours for remarketing to a limited number of clients" and that "[h]ours must be used by September 2023." *Id.* The slide deck presents images of VistaJet's jet offerings, including photographs of the inside and internal floorplans of some of VistaJet's planes which Pioneer personnel obtained from VistaJet's website. *Id.*; *see also* Pls Counter-Statement ¶ 100. The slide deck also outlines the financial terms Pioneer was offering to potential buyers including, but not limited to, available hours and the applicable hourly rate. Franco Decl. IEx. 17. Many of these financial terms mirrored those which Pioneer and VistaJet agreed to in the Assignment. Pls Counter-Statement ¶ 104. Pioneer never sought or obtained consent or authorization from VistaJet of the contents of the slide deck or of the usage of the VistaJet name and photographs. *Id.* at ¶¶ 105-106.

Pioneer personnel also set internal goals to market the VistaJet hours widely to "280-300 prospects." *Id.* at ¶¶ 109-110. Pioneer's outreach included reaching out to several brokers to assist with the resale of the hours and contacting 86 individuals, including some active VistaJet customers, to offer or market the VistaJet hours. *Id.* at ¶¶ 111-113; *see also id.* at ¶¶ 119-120, 124. Pioneer did not seek VistaJet's prior approval before reaching out to any of these prospects. *Id.* In at least some of this outreach, Pioneer personnel stated that the company had "partnered with Vista jet [*sic*] to re-sell" the hours. *Id.* at ¶ 132.

For their efforts, Pioneer was able to sell VistaJet hours to three customers. *Id.* at ¶ 137. In the midst of editing contractual language for an agreement with one of their buyers, Pioneer personnel stated that "many of the[] terms parrot [Pioneer's] agreement . . . with VistaJet."

Franco Decl. I Ex. 81.  Specifically, Section 2 of the Insight Agreement Pioneer executed with buyers "reference[s] rights or obligations that VistaJet" applies to the Buyer.  *Id.* at Ex. 79. While the Insight Agreement did not specify which provisions in Section 2 were VistaJet's terms, the terms included in that section included information about aircraft, pricing, hours, service area, minimum booking, flight time, fuel surcharge, delay, cancellation, alternative aircraft, force majeure provisions and more.  *Id.*  The Insight Agreement also charged buyers the same hourly rate as that which VistaJet charged SoftBank, which was a rate different from that which VistaJet charged Pioneer.  *Id.*  The Pioneer agreement also included a termination clause under which Pioneer would "be entitled to retain all amounts paid for the Total Flight Hours and resell the remaining Total Flight Hours in its sole discretion, with Customer otherwise receiving a full refund of their Deposit less any outstanding invoices from [Pioneer]."  *Id.*

In July 2022, VistaJet sent Pioneer a notice that Pioneer had "triggered an Event of Default" by disclosing confidential terms of the Program Agreement to third parties and utilizing VistaJet's trademarks in its slide deck without permission.  Pls Counter-Statement at ¶¶ 141-142. For their part, Pioneer continued to disseminate the slide deck after receiving VistaJet's cease-and-desist letter.  *Id.* at ¶ 145.  Upon Pioneer's refusal, VistaJet declared an Event of Default under the Parties' agreement and barred Pioneer's customers from utilizing their flight hours. Def's Counter-Statement at ¶ 74.

## STANDARD OF REVIEW

### I.    Summary Judgment

Summary judgment is proper where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56;

*Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). There is no issue of material fact where the facts are irrelevant to the disposition of the matter. *Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 761 (S.D.N.Y. 2013); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that a fact is material if it would "affect the outcome of the suit under governing law"). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

In deciding a summary judgment motion, courts must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). Courts may not assess credibility, nor may they decide between conflicting versions of events because those matters are reserved for the jury. *Jeffreys v. City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (quoting *Anderson*, 477 U.S. at 252). At summary judgment, the moving party has the burden "to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).

## II.   Sealing

There is a common-law and First Amendment right of public access to judicial documents." *Valassis Commc'ns, Inc. v. News Corp.*, No. 17-CV-7378 (PKC), 2020 WL 2190708, at *1 (S.D.N.Y. May 5, 2020) (citing *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 124 (2d Cir. 2006)). "The Second Circuit has articulated a three-step process for determining whether documents should be placed under seal." *Church Ins. Co. v. ACE Prop. & Casualty Ins. Co.*, No.

10 CV 698 (RJS), 2010 WL 3958791 (quoting *Mut. Marine Office, Inc. v. Transfercom Ltd.*, No. 08 CV 10367 (PGG), 2009 WL 1025965, at *4 (S.D.N.Y. Apr. 15, 2009)).   First, a court must determine whether the presumption of access attaches.   A presumption of access attaches to any item that constitutes a "judicial document"—i.e., an "item . . . relevant to the performance of the judicial function and useful in the judicial process." *Lusgoch*, 435 F.3d at 119.   Second, if the court determines that the item to be sealed is a "judicial document," the court must then determine the weight of the presumption of access.   *Id*.   "The weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *Id*. (quoting *United States v. Amodeo,* 71 F.3d 1044, 1048 (2d Cir.1995)).   "Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Id*.   Finally, after determining the weight of the presumption of access, the court must "balance competing considerations against it." *Id*.   "Such countervailing factors include but are not limited to the danger of impairing law enforcement or judicial efficiency and the privacy interests of those resisting disclosure." *Id.*

Where the submissions "directly affect" the court's adjudication of the case, there is "a strong presumption of access." *See Mut. Marine Office*, 2009 WL 1025965, at *5.   In order to rebut such a presumption, the moving party "must offer specific facts 'demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Id.* (quoting *Lugosch*, 435 F.3d at 120).   "[B]road allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test [for sealing judicial documents]." *E.E.O.C. v. Kelley Drye & Warren LLP*, No. 10 Civ. 655, 2012 WL 691545, at *3 (S.D.N.Y. Mar. 2, 2012).   Importantly, "[t]he mere existence of a confidentiality agreement . . . does not demonstrate that

sealing is necessary." *Church Ins. Co.*, 2010 WL 3958791, at *3; *see also De Kafati v. Kafati Kafati*, No. 22-CV-9906 (VSB), 2022 WL 17552457, at *1 (S.D.N.Y. Dec. 9, 2022) ("The presumption of public access to judicial documents is not overcome simply because the documents are covered by a confidentiality agreement."). "The party seeking to place the judicial documents under seal bears the burden of overcoming the presumption of public access." *Rogers v. Henry*, No. 16-cv-5271, 2017 WL 5495805, at *5 (E.D.N.Y. Sept. 12, 2017) (collecting cases).

## DISCUSSION

Plaintiff moves for summary judgment against each of Defendant's counterclaims. *See* ECF No. 141 ("Pls Mem."). Defendant moves for summary judgment against each of Plaintiff's claims as well as for their own counterclaims. *See* ECF No. 148 ("Defs Mem.").

As stated previously, Pioneer brought this action against VistaJet for declaratory relief as to Plaintiff's potential Lanham Act and copyright claims, and for breach of contract and tortious interference with contract in violation of New York state law. *See* Compl. In their Complaint, Plaintiff claims that VistaJet breached the parties' agreement by: (1) failing to provide sufficient notice and an opportunity to cure Pioneer's alleged breach, and (2) refusing to provide jet hours to Pioneer's customers. *Id.* at ¶¶ 23-24. Plaintiff also claims that VistaJet intentionally and improperly interfered with Pioneer's contracts with its customers by barring them from utilizing the VistaJet hours those customers purchased from Pioneer. *Id.* at ¶¶ 34-35.

In their Answer, Defendants claim that Plaintiff is barred from recovering by the doctrine of unclean hands, as well as Pioneer's own material contractual breach and trademark infringement. ECF No. 52 ("Answer") at 23-24. Defendant also raises counterclaims of fraudulent inducement, breach of contract, violations of the Lanham Act, common law trademark infringement, and unjust enrichment. Counterclaims at 13-21. For their breach of contract

claim, Defendants allege that Plaintiff improperly "disclose[d] the commercial terms of the VistaJet Program" to third parties in violation of the Agreements' nondisclosure provisions and sections stating that the Agreements did not create a joint venture between the companies. *Id.* at ¶¶ 58-64. On their fraudulent inducement claim, VistaJet alleges that Pioneer officials made several actionable material misrepresentations, including but not limited to, that Pioneer "would not remarket the VistaJet bulk hours to the wider aviation market" and "had 8 [ultra high net worth individuals] in mind . . . who needed flight time." *Id.* at ¶¶ 51. For their trademark and copyright claims, VistaJet argues that Pioneer's unlawfully used VistaJet's marks in their Insight promotional materials *Id.* at ¶¶ 65-82, 89-99. And finally, on their unjust enrichment claim, Defendants argue that Pioneer's disclosure of confidential commercial terms and misappropriation of VistaJet's intellectual property constituted unlawful deceptive practices. *Id.* at ¶¶ 83-88.

A. <u>Fraudulent Inducement</u>

"Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (citing *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (1996)). Additionally, to state a claim for fraudulent inducement under the state law alongside a standard claim for breach of contract, a plaintiff must either: "(a) demonstrate a legal duty separate from the duty to perform under the contract; (b) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (c) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bloom v.*

*Rock*, 2010 U.S. Dist. LEXIS 53995, at *21 (S.D.N.Y. May 27, 2010).  Under the law of this Circuit, "merely falsely indicating an intent to perform under a contract is not sufficient to support a claim of fraud."  *Id.* at *22 (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 19 (2d Cir. 1996)).  Yet, false intent can create liability where "there existed an intent not to perform at the time the promise was made."  *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994).  A plaintiff's "assertion that [the defendant], at the time it made the promise, knew that it did not intend to fulfill it" can make what initially appears to be a future promise into an "allegation of present fact which gives rise to a claim of fraudulent inducement." *Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992); *see also United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 660 (2d Cir. 2016) ("Fraud requires much more than simply not following through on contractual or other promises.  It requires a showing of deception at the time the promise is made.  A subsequent breach, although consistent with deceptive intent[,] is not in and of itself evidence of such an intent.") (quoting *Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1007 (7th Cir. 2004).

VistaJet claims that Pioneer made two false precontractual statements which give rise to a claim of fraudulent inducement.  These two alleged statements are: (1) that Pioneer then had a stable of up to eight customers with immediate need for jet hours, and (2) that Pioneer would not remarket the VistaJet hours to the wider aviation market.  *See* ECF No. 177 ("Defs Opp. Mem.") at 12.  The operative agreements here clearly limited Plaintiff's ability to resell the jet hours to eight clients and instated sweeping confidentiality provisions which would limit Plaintiff's ability to market the hours.  As such, these alleged misrepresentations are "related to the services plaintiff expected under the contract and therefore do not relate to a legal duty separate from the duty to perform under the contract and are not representations extraneous or collateral to the

contract." *PFT of Am., Inc. v. Tradewell, Inc.*, 98 Civ. 6413 (RPP), 1999 U.S. Dist. LEXIS 3870, at *9 (S.D.N.Y. Mar. 31, 1999).   Therefore, these counterclaims fail as a matter of law.

  B. <u>Breach of Contract</u>

  To establish a breach of contract claim under New York law, a plaintiff must establish: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Jill Stuart (Asia) LLC v. Sanei Intern. Co.*, 548 Fed.Appx 20, 21 (2d Cir. 2013) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).   "[W]ritten notice requirements are fully enforceable" and ""serve the valuable function of allowing the purportedly breaching party to distinguish between minor complaints or posturing by its contractual partner and an actual threat of termination." *Art of War Music Publ'g, Inc. v. Andrews*, 98 Civ. 6034(JSR), 2000 U.S. Dist. LEXIS 2509, at *5 (S.D.N.Y. Mar. 2, 2000) (citations omitted).   A reviewing court should only "construe the notice provision as if it were a common law pleading requirement under which every slip would be fatal" in certain limited circumstances.   *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 182 (S.D.N.Y. 2011) (quoting *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 925 (2d Cir. 1977) (declining to find defendants liable where they provided plaintiffs with written notice of a material breach as to only one contractual provision but not another)).   Because the evidentiary record clearly establishes the existence of an agreement and liquidated damages on VistaJet's claim, we discuss only the element of breach.[1]

---

[1] The Parties both acknowledge the existence of an agreement in fulfillment of the first element.  ECF No 168 ("Pls Opp. Mem.") at 9.  Plaintiff has also failed to "proffer sufficient facts to demonstrate that at the time of contracting (1) prospective actual damages were readily ascertainable or (2) damages agreed upon were conspicuously disproportionate to . . . foreseeable losses," such that VistaJet has adequately plead liquidated damages for their breach of contract claim.  *Edward Andrews Grp., Inc. v. Addressing Servs. Co.*, 2005 U.S. Dist. LEXIS 30125, at *16 (S.D.N.Y. Nov. 29, 2005) (quoting *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380, 795 N.Y.S.2d 502, 507, 828 N.E.2d 604, 609 (2005)).

1.   Breach

VistaJet argues that summary judgment is warranted on Pioneer's breach of contract claim because Pioneer's own material breach "relieved or excused [VistaJet] from its further performance obligation."  Defs Mem. at 18 (quoting *Olin Corp. v. Ins. Co. of N. Am.*, 218 F. Supp. 3d 212, 224 (S.D.N.Y. 2016)).  Defendants' rationale is that because Pioneer "cannot raise a trial [*sic*] issue of fact as to whether [Plaintiff] violated the nondisclosure provision[s]," and the provisions stating the agreements did not create any joint partnership with VistaJet, summary judgment is warranted.  Defs Mem. at 15.

We consider each contractual provision in turn.  First, on the nondisclosure provisions, Plaintiff advances the view that because nothing in Section 3.4.1 of the Addendum, which expressly authorized Pioneer's transfers of the VistaJet hours to up to eight customers, restricted Pioneer from marketing the hours or granted VistaJet a right to preapprove marketing materials, they can not be liable for breach.  Pl's Opp. Mem. at 11.  Plaintiff's argument does not tell the whole story.  SoftBank's assignment to Pioneer clearly stated that Plaintiff would be required to abide by the terms of the "VistaJet Contracts" that had dictated the bank's relationship with the Defendant.  Franco Decl. I Ex. 17.  The VistaJet Contracts' nondisclosure provisions barred Pioneer from "disclos[ing] the legal and commercial terms of this Program to any third party without VistaJet US's prior written approval . . . [except] to permit the Member [SoftBank/Pioneer] to comply with contractual obligations under this Program."  *Id.*

From this, a legal question emerges—assuming *arguendo* that the marketing materials contained information covered under the nondisclosure provision, could Plaintiff's dissemination of the materials qualify as conduct undertaken to comply with Pioneer's contractual obligations under Section 3.4.1 of the Addendum—namely to re-sell the VistaJet hours—such that the

nondisclosure provisions' contractual performance safe harbor would apply?  This Court answers this question in the negative.  Section 3.4.1's text merely grants to Pioneer the authority to "re-sell" the hours, the plain meaning of which is "to give up (property) [*sic*] to another for something of value," not to market or promote the hours.  RESELL, Merriam-Webster Legal Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/resell.  The Addendum's grant of authority to "re-sell" did not, by its text, give Plaintiff permission to disclose terms of the Agreement merely in hopes of attracting potential customers through its dissemination of marketing materials.

Having established that Plaintiff was not permitted, as a matter of law, to disseminate information contained within or related to the relevant Agreements in marketing materials without VistaJet's prior approval, we next consider whether a triable question of fact exists as to whether such breach occurred.

Pioneer contends that VistaJet is not entitled to summary judgment on this theory of breach because the marketing slide deck merely conveyed to potential clients the terms which Pioneer would impose on re-sale agreements and did not disclose which, if any, of the terms were imposed by VistaJet in their agreement with Pioneer.  Pl's Opp. Mem. at 14-15.  A thorough investigation of the record shows that Pioneer did, in fact inform re-sale customers that certain provisions of their re-sale contract "parrot[ed] [Pioneer's] agreement . . . with VistaJet."  Franco Decl. I Ex. 81.  In addition, Pioneer's own Chief Operating Officer stated that several of the marketing deck's terms "mirrored" those included in the Parties' contract so that potential consumers would be aware of the operational terms and conditions which VistaJet had in place.  Franco Decl. I Ex. 13; *see also* Pl's Counterstatement ¶ 104.  Therefore, "[e]ven drawing all reasonable inferences in [Pioneer's] favor, this Court must conclude that [Plaintiff's] disclosure .

. . was a clear violation" of the nondisclosure provision." *Benderson v. N.W. Sav. Bank*, No. 14-CV-96S, 2017 U.S. Dist. LEXIS 171939, at \*13 (W.D.N.Y. Oct. 16, 2017).

The next theory of breach which Defendants allege is that Pioneer held themselves out to potential clients as having partnered with VistaJet to re-sell the hours in violation of Section 6.6 of the Agreements.  VistaJet has produced ample evidence in the form of email communications with prospective clients in which Pioneer states that the two firms had "partnered" to re-sell the hours, *see* Franco Decl. I Ex's. 73-76, as well as the marketing materials themselves which attempt to attract clients to the "Insight Card with Vista Opportunity," and "INSIGHT – VISTA OPPORTUNITY," while stating that Pioneer "has contracted with VistaJet US for a block of hours for remarking to a limited number of clients."  *Id.* at Ex. 74.  Pioneer's rebuttal that the marketing materials, read in their totality, make clear that Pioneer, not VistaJet, was "offer[ing] the Insight Card" and would be "manag[ing] all aspects of the trip" is insufficient.  Pls Opp. Mem. at 16-17.  The plain language of Pioneer's statements to third-parties not only implies but even states forthrightly that the Parties had engaged in a partnership such that Defendant is entitled to summary judgment on this theory of breach as well.

Therefore, because Plaintiff's material breaches "relieved or excused [VistaJet] from its further performance obligation," Defendant's motion for summary judgment as to Pioneer's claim for breach of contract is granted.

C.  Tortious Interference

The elements of a tortious interference claim are as follows: "(1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiffs or used dishonest, unfair or improper means; and (4) injury to the relationship." *Purgess v. Sharrock*, 33 F.3d 134, 141 (2d Cir. 1994).

Plaintiff alleges that VistaJet's failure to perform on the contract following Pioneer's material breach tortiously interfered with Pioneer's contracts with their current and prospective clients. Pls Mem. at 26-30. As this Court has found, VistaJet "was entitled to cut the Plaintiffs off" upon Pioneer's breach of the nondisclosure and partnership provisions of their contract. *Lazar's Auto Sales, Inc. v. Chrysler Fin. Corp.*, 83 F. Supp. 2d 384, 392 (S.D.N.Y. 2000). Therefore, VistaJet's actions could not, as a legal matter, constitute an "intentional interference, without justification, with" Pioneer's contractual rights. *Campbell v. Gates*, 236 N.Y. 457, 460, 141 N.E. 914, 915 (1923). Therefore, Plaintiff's tortious interference claim is dismissed.

D. <u>Trademark Claims</u>

"The elements of a successful New York common law claim of trademark infringement parallel the elements required for a Lanham Act trademark infringement claim." *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 479 (S.D.N.Y. 2020) (citing *Van Praagh v. Grattan*, 993 E. Supp. 3d 293, 302 (E.D.N.Y. 2014)). Defendant brings counterclaims under Section 43(a) of the Lanham Act which, as to unregistered marks, renders liable those who "use[] in commerce any word, term, name, symbol, or device, or any combination thereof, . . . which . . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods . . . by another person. 15 U.S.C. § 1125(a)(1)(A). A trademark plaintiff alleging a confusion claim "must demonstrate that (1) it has a valid mark that is entitled to protection and that (2) the defendant's actions are likely to cause confusion with that mark." *Tiffany and Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) (internal quotations omitted).

When assessing whether there is a likelihood of consumer confusion for trademark infringement, a reviewing court must consider the eight factors set forth in *Polaroid Corp. v.*

*Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961).  These factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009).  "The application of the Polaroid test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013) (quotation marks omitted).  Where a trademark defendant raises nominative fair use, the reviewing court, in addition to the eight *Polaroid* factors, also considers: "(1) whether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark; (2) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder, that is, whether the defendant's conduct or language reflects the true or accurate relationship between plaintiff's and defendant's products or services." *Int'l Info. Sys. Sec. Certification Consortium v. Sec. Univ., LLC*, 823 F.3d 153, 168 (2d Cir. 2016).

Defendant claims here that Plaintiff's usage of the term "VistaJet" in their marketing materials violated the company's trademarks.  Counterclaims ¶¶ 65-82.  Plaintiffs argue that summary judgment against Defendants is warranted because: (1) Pioneer's usage of the "VistaJet" term constituted permissible nominative use, (2) Defendant has failed to adequately present a triable question on likelihood of consumer confusion, and (3) VistaJet has not

adequately pleaded damages.

The Court considers first the nominative use factors and finds that VistaJet has established one factor weighs in their favor and has presented a triable question as to the remaining two factors. VistaJet argues as to the first factor, necessary usage, that Pioneer was under no obligation to make use of the marks and simply could have stated in their advertisements that they were selling luxury charter flight hours at a discounted rate. Defs Opp. Mem. at 20-21. Pioneer's response that usage of the VistaJet marks was necessary to comply with Federal Aviation Administration regulation requiring the disclosure of aircraft operators to consumers is ineffective. Pls Mem. at 16. The relevant regulation requires the disclosure of the "corporate name of the direct air carrier . . . in operational control of the aircraft" at a time "[b]efore entering a contract for a specific flight or series of flights." 14 C.F.R. § 295.24(a). Setting aside the fact that the regulation does not require such disclosure in marketing materials or advertisements, VistaJet is merely a broker and does not operate as an air carrier or operator such that Pioneer was ever under any obligation to disclose their corporate name to consumers. Def's Counter-statement at ¶ 288. The first nominative use factor therefore weighs in Defendant's favor.

Second, there are genuine issues of material fact as to whether Pioneer's usage of the marks was greater than necessary. Defs Opp. Mem. at 21. In support of this claim, Defendant refers to the marketing deck itself in which VistaJet marks are prominently displayed at the top of every single page and was entitled "INSIGHT – VISTA OPPORTUNITY." Franco Decl. I Ex. 28. VistaJet also raises Pioneer's usage of the marks while promoting its own additional services unrelated to the VistaJet hours including Pioneer's provision of "charter alternatives," "flight coordination" and "metrics, reporting and analysis." Defs Opp. Mem. at 22.

Finally, a fact finder could find that the final nominative fair use factor also weighs in favor of Defendants.  Here, VistaJet presents evidence that the marketing materials' extensive usage of the VistaJet marks and textual references to Pioneer's ability to "coordinate with VistaJet" went so far as to heavily imply that the two firms had partnered.  VistaJet has therefore presented sufficient evidence to present a triable fact as to whether Pioneer's usage of the marks "[was] likely to create confusion regarding affiliation, sponsorship, or endorsement."  *Nespresso USA, Inc. v. Afr. Am. Coffee Trading Co. LLC*, No. 15CV5553-LTS, 2016 U.S. Dist. LEXIS 71942, at *14 (S.D.N.Y. June 2, 2016).

Moving onto the *Polaroid* factors, elements 1-3 all weigh in VistaJet's favor.  On the strength of the trademark, the VistaJet marks were all registered on the Principle Register and are presumably distinctive.  *See* ECF No. 173 ("Defs Counter-statement") at ¶ 246; *Better Angels Soc'y, Inc. v. Inst. for Am. Values, Inc.*, 419 F. Supp. 3d 765, 775 (S.D.N.Y. 2019).  On the similarity of the marks, it is undisputed that the VistaJet marks at issue are identical to Defendant's trademark.  *Id.* at ¶¶ 77-79, 275, 277.  With regards to the third factor, it is apparent from the evidence that the parties offer similar services and compete with one another.  *Id.* at ¶¶ 286-287.

The fourth factor— the likelihood VistaJet will bridge the gap—is inapplicable here because it is undisputed that VistaJet and Pioneer are both in direct competition.  *See Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 218 (2d Cir. 2003) (finding this *Polaroid* factor "not relevant" where "products are in direct competition").

For the fifth *Polaroid* factor, Defendants proffer four anecdotes in which VistaJet officials fielded inquiries from consumers regarding Pioneer's right to resell the VistaJet hours.  Defs Counter-statement at ¶¶ 97, 108-109, 117, 121, 127, 133-135.  This evidence includes

communications with clients and aviation industry brokers in which those third parties expressed confusion as to the legitimacy of the affiliation of the Parties. *See Virgin Enters. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003) (affirming a finding that confusion regarding brand affiliation was sufficient evidence of actual confusion). VistaJet presents sufficient evidence to present to a jury on this *Polaroid* factor.

On the sixth factor, Defendant relies upon Plaintiff's replete usage of the marks throughout their marketing materials as evidence of their usage of the marks in bad faith to suggest the existence of a partnership between the firms. Defs Opp. Mem. at 18-19. This, while not conclusive, presents a viable question for resolution by a jury as to the question of Plaintiff's bad faith in suggesting "an untruthful association" between the two companies which did not exist. *GlaxoSmithKline LLC v. Laclede, Inc.*, No. 18-CV-4945 (JMF), 2019 U.S. Dist. LEXIS 10952, at *31-32 (S.D.N.Y. Jan. 23, 2019) (finding bad faith sufficiently pleaded based upon prominent and repetitive usage of trademark plaintiff's marks).

Defendant has also proffered sufficient evidence as to the seventh factor—the relative quality of the products. Where the quality of the respective parties' product or service is the same, a greater likelihood of confusion arises. *See Flat Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 381 (S.D.N.Y. 2015). VistaJet argues that Pioneer's advertised product was at least of a similar quality as VistaJet's as Plaintiffs advertised high quality "24/7 service" and "manage[ment of] all aspects of the trip" in their deck just as VistaJet provides for its own consumers. Defs Counter-statement ¶¶ 78-80, 249, 286.

While VistaJet argues that factor eight—the sophistication of the relevant customers—is neutral, neither party presents evidence in support of that assertion. Defs Opp. Mem. at 19-20. "Therefore, [the] [C]ourt is entitled to reach a conclusion about consumer sophistication based

solely on the nature of the product or its price." *Chanel, Inc. v. WGACA, LLC*, 2022 U.S. Dist. LEXIS 55880, at *22 (S.D.N.Y. Mar. 28, 2022) (quotation marks omitted) (quoting *SLY Magazine, LLC v. Weider Publications L.L.C.*, 529 F. Supp. 2d 425, 442 (S.D.N.Y. 2007). This case deals with exorbitantly expensive services utilized almost exclusively by the world's wealthiest individuals and corporations. The record establishes that the procurement of private jet services is a highly sophisticated process involving consultation with brokers and market players as well as the extensive negotiation of service terms. Defs Counter-Statement ¶¶ 47, 87, 90, 91, 96, 108-109. *Polaroid* factor eight weighs in Pioneer's favor.

In summation, one nominative use and three *Polaroid* factors weigh in VistaJet's favor, VistaJet has presented material questions of fact as to the remaining nominative use factors and *Polaroid* factors 5-7, factor 4 is inapplicable in this case, and factor 8 weighs in Pioneer's favor. Because VistaJet has presented significant triable questions of fact related to actual consumer confusion, Pioneer's purported bad faith, the respective quality of the products, and whether Pioneer impermissibly implied the existence of a partnership to prospective consumers, Plaintiff's summary judgment motion is denied as to this counterclaim.

    E.  <u>Copyright Claims</u>

To make out a claim of copyright infringement, a plaintiff must establish "(1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original. *Urbont v. Sony Music Entm't*, 831 F.3d 80, 87 (2d Cir. 2016) (quoting *Boisson v. Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir. 2001)). "Pursuant to 17 U.S.C. § 501(b), the legal or beneficial owner of rights under a copyright may pursue an action for infringement of that copyright committed while he or she is the owner of it." *Plastic Equip., Inc. v. Toytrackerz, LLC*, 07-cv-2253, 2009 U.S. Dist. LEXIS 27787, 2009 WL 902422, at *5 (D. Kan. March 31, 2009). While

Section 204(a) renders unwritten assignments of copyrights generally invalid, a subsequent written and signed memorialization of a prior unwritten agreement to transfer copyright can be sufficient.  17 U.S.C. § 204(a); *see also Eden Toys, Inc. v. Florelee Undergarment Co., Inc.*, 697 F.2d 27, 36 (2d Cir. 1982).  Reviewing courts will also consider sworn declarations alongside such subsequent written and signed memoranda when determining the validity of copyright ownership.  *See, e.g., Sweet Gisele, Inc. v. True Rock CEO, LLC, No. 17 CV 5170 (FB)(RML),* 2018 U.S. Dist. LEXIS 151262 (E.D.N.Y. Sep. 4, 2018) (considering and ultimately finding unreliable the validity of unsworn declarations confirming prior copyright transfer); *Conan Props. Int'l LLC v. Ricardo Jove Sanchez*, No. 17 CV 162, 2018 U.S. Dist. LEXIS 138203 at *3 (E.D.N.Y. Aug. 15, 2018) (finding valid copyright transfer based in part upon a declaration of plaintiffs' representative describing the terms of the transfer).  What's more, "[c]ourts have repeatedly held that where a transferor and transferee of a copyright agree that the transfer was valid, an alleged infringer may not use the writing requirement as a sword to avoid liability." *Russian Entm't Wholesale, Inc. v. Close-Up Int'l, Inc.*, 767 F. Supp. 2d 392, 402 (E.D.N.Y. 2011) (collecting cases).

VistaJet alleges that Pioneer used several of its copyrighted photographs in their marketing materials unlawfully.  While Pioneer concedes that they utilized the photographs, they argue that VistaJet did not own the copyrights in question at the time of Pioneer's usage.  Pls 56.1 Statement at ¶ 82; *see also* Pls Mem. at 24.  VistaJet alleges that the entity VistaJet International Limited ("VJIL") acquired the copyright to the photographs and assigned Defendant an exclusive copyright license to utilize the photographs in March of 2021.  ECF No. 174 ("Romano Decl.") at Ex. 4.  As evidence of this arrangement, VistaJet has presented an August 22, 2022 "memorializ[ation]" of their license which states that VistaJet "has had a

license to copy, reproduce, distribute, display, and create derivative work of the" photographs and includes the transfer to VistaJet of "any and all causes of action and claims accrued or accruing for current or past infringement, threatened infringement or alleged infringement." *Id.* Additionally, as evidence of the initial 2021 transfer of ownership rights from the photographer to VJIL, VistaJet has presented a sworn declaration from the photographer confirming "transfer of all copyrights in the Images to VJIL on or around 16 March 2021," ECF No. 175 ("Migliaccio Decl.") another "confirm[ation]" of the transfer signed on August 19, 2022, Romano Decl. Ex. 3, and an invoice from the photographer Simone Migliaccio dated March 16 2021 stating that VJIL was charged for "day rate," "post production," "equipment rental," and "transport." *Id.* at Ex. 2.

Plaintiff's arguments are without merit.  VistaJet's proffered evidence of transfer is complete and has remained consistent throughout the pendency of this action.  Plaintiff's reliance on the *Sweet Gisele, Inc.* case is therefore unpersuasive as the District Court's decision in that case was based upon the party alleging ownership having "made several contradictory statements as to its ownership of the copyrights at issue."  *Sweet Gisele, Inc. v. True Rock CEO*, LLC, No. 17 CV 5170 (FB)(RML), 2018 U.S. Dist. LEXIS 151262, at *6 (E.D.N.Y. Sep. 4, 2018).  No such contradictions or inconsistencies exist here as no dispute exists as between the copyright transferor and transferee.  *See Russian Ent. Wholesale, Inc.*, 767 F. Supp. 2d at 402.

Pioneer's remaining arguments as to waiver and damages are similarly unavailing.  To establish waiver under New York law, there must be a showing of "intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it."  *O'Neil v. Ratajkowski*, 563 F. Supp. 3d 112, 135 (S.D.N.Y. 2021) (quoting *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, 80 F. Supp. 3d 535, 540 (S.D.N.Y. 2015)).  The alleged waiving conduct "must be clear, unmistakable and without ambiguity."  *Id.*  Plaintiff's claim that Defendant allegedly

waived its rights in the photographs due to their alleged broad dissemination online falls short of this standard.

On damages, while Plaintiff is correct that VistaJet can not claim statutory damages because they have not complied with 17 U.S.C. § 412's registration requirements, Plaintiff's argument that Defendant has failed to state damages at all is unsuccessful.  Defendant has sufficiently established that triable issues as to actual damages exist by preferring their loss of a reasonable license fee.  VistaJet proffers they missed out on a license fee of $1,375 per infringed photograph based upon license fee estimates for like photographs generated by the price calculator tool on Getty Images's website.  In support of their allegations, Defendant also provides several screenshots confirming that their search parameters conformed to the characteristics of the copyrighted photographs.  ECF No. 176 ("Franco Decl. II") at Exs. 72-76. This evidence is sufficient to set out actual damages as "[c]ourts in this Circuit have relied on . . . [the] benchmark license fees estimated by the price calculator tool on Getty Images's website" to establish actual damages.  *Juliff v. Headout, Inc.*, 2021 U.S. Dist. LEXIS 165118, at *4 (S.D.N.Y. Aug. 31, 2021) (collecting cases); *see also McGlynn v. Towers Investors.com Inc.*, No. 19 Civ. 89 (PAE) (GWG), 2021 U.S. Dist. LEXIS 86159 at *5 ("We accept that screenshots from the price calculator provided by the Getty Images website in some circumstances may aid in determining the fair market value for a licensing fee of a photograph.").  Therefore, partial summary judgment is granted as to Defendant's copyright claims and summary judgment as to damages is denied.

F.  Unjust Enrichment

The elements of unjust enrichment under New York law are "(1) defendant was enriched; (2) at plaintiff's expense; and (3) equity and good conscience militate against permitting

defendant to retain what plaintiff is seeking to recover." *Briarpatch, Ltd. v. Phoenix Pictures, Inc.*, 373 F.2d 296, 306 (2d Cir. 2004). "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N. Y., Inc.*, 18 N.Y.3d 777, 967 N.E.2d 1177, 1185, 944 N.Y.S.2d 732 (N.Y. 2012). Rather, the claim "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.* "Accordingly, courts in this circuit frequently dismiss unjust enrichment claims brought in Lanham Act cases." *WowWee Grp. Ltd v. Meirly*, No. 18-CV-706 (AJN), 2019 U.S. Dist. LEXIS 51905, at *21 (S.D.N.Y. Mar. 27, 2019) (collecting cases).

VistaJet alleges that Pioneer is liable for unjust enrichment because Pioneer "engaged in several unfair and deceptive acts including misappropriating VistaJet's intellectual property to create the false impression in the relevant market for aviation services that VistaJet partnered with FCA and/or vouched for the quality of its goods and services that VistaJet does not oversee or control resulting in customer confusion that caused FCA's enrichment at VistaJet's expense." Defs Mem. Opp. at 13 (citing Counterclaims at 19). "This case does not present the "unusual" circumstances needed to state an unjust enrichment claim." *Chen v. Hiko Energy, LLC*, No. 14 CV 1771 (VB), 2014 U.S. Dist. LEXIS 181846, at *18 (S.D.N.Y. Dec. 29, 2014).

Plaintiff's motion for summary judgment as to this claim is therefore granted.

G. Sealing

The Court grants the Parties requests to seal except as to those documents expressly denied sealing herein. The Parties' requests to seal exhibit documents expressly referenced in the Court's opinion are denied outright because these documents directly support this Court's

findings and the Parties have failed to sufficiently articulate a countervailing interest supporting sealing.

Notwithstanding the aforementioned holding, the Court denies the Parties requests to seal the following documents in their entirety because such sealing would not be narrowly tailored to serve the purposes underlying sealing.  *See Lugosch*, 435 F.3d at 119-20.  These documents are as follows: Exhibits 20, 24, 37, 50, 52, 57, 58, 60, 62, 64, 68, 72, and 73 of the Haveles Declaration at ECF No. 142, Exhibits 1-4, 6-8, 13-16, 18, 23, 24, 37, 57, 64, 66, 67, 68-71, 74-80, 82, 85, 86, and of the Franco Declaration at ECF No. 150, Exhibits 12, 19, 28, and 32 of the Haveles Declaration at ECF No. 171, Exhibits 1, 3, 6-12, 14, 16, 18, 22, 26-32, 41-50, 55, 59, 60, and 62 of the Franco Declaration at ECF No. 178, and Exhibits 1, 3, and 6-8 of the Franco Declaration at ECF No. 202.  The Parties are hereby **ORDERED** to either docket these documents in their entirety or file redacted versions of the underlying documents which conceal only that information to which the Parties have a cognizable interest in sealing.  The Parties are reminded of Magistrate Judge Moses' admonition that "[t]he fact that the parties agreed among themselves that [documents] would be considered confidential . . . does not answer (or even bear on) the question whether sealing is warranted under the standards set forth in *Lugosch*."  ECF No. 88 at 1.

## CONCLUSION

For the foregoing reasons, summary judgment is **GRANTED** as to Plaintiff's claim for declaratory relief and VistaJet's fraudulent inducement, breach of contract, and unjust enrichment counterclaims and Pioneer's tortious interference claim.  Partial summary judgment as to VistaJet's copyright and trademark claims is also **GRANTED**.  The Parties' motions to seal at ECF No. 185 is **DENIED** without prejudice pending the resolution of the outstanding

sealing issues and the motions to seal at ECF Nos. 144, 163, 170, 189, 195, and 197 are

**GRANTED in part and DENIED in part**.  Plaintiff's request for oral argument is also

**DENIED.**  The Parties are hereby **ORDERED** to file renewed motions to seal and/or unsealed

versions of their memoranda, Rule 56.1 statements, and declarations on or by April 19, 2024.

The Clerk of the Court is respectfully directed to terminate the outstanding motions at ECF Nos

135, 136, 143, 144, 163, 170, 185, 189, 195, 197, and 203.

**SO ORDERED.**

**Dated:  March 29, 2024**
       **New York, New York**

_____
       **ANDREW L. CARTER, JR.**
       **United States District Judge**